# MARCH, 1941.

LOUIE SAUNDERS, APPELLANT, V. GUSTUS E. PRUE AND DEWITT CHEVROLET COMPANY, A CORPORATION, RESPONDENTS.—151 S. W. (2d) 478.

Kansas City Court of Appeals. May 5, 1941.

*Louis R. Weiss* and *Mosman, Rogers & Bell* for respondent, DeWitt Chevrolet Company.

*Gossett, Ellis, Dietrich & Tyler* for appellant.

BLAND, J.—This is an action for personal injuries and property damages. There was a verdict and judgment in favor of plaintiff in the sum of $333. The motion for a new trial, filed by the defendant, Prue, was overruled and he has not appealed. The motion for a new trial filed by the defendant, DeWitt Chevrolet Company, was sustained by the court on the ground that it should have given said defendant's instruction in the nature of a demurrer to the evidence. Plaintiff has appealed.

The facts show that on July 19, 1934, plaintiff was hauling water by the use of a wooden tank set upon the running gear of an iron-wheeled wagon to which was hitched a team of mules, all owned by him. He and one Peryn Clark were seated on the tank, plaintiff driving. The wagon was proceeding toward the east, down a slight grade and, on Highway No. 40, when it neared Blue Springs, it was

struck in the rear by an automobile being driven eastwardly by the defendant, Prue, and owned by the defendant, DeWitt Chevrolet Company. The collision resulted in personal injuries to plaintiff and damage to his wagon.

In his petition ,and at the trial, plaintiff sought to recover against the defendant, DeWitt Chevrolet Company, on the ground that it was negligent in intrusting the automobile to the defendant, Prue, when it knew, or by the exercise of ordinary care, should have known, that he was incompetent and not qualified to drive the automobile upon the public highways and that, by reason of its action, in so doing, it was legally liable for all of the damages suffered by the plaintiff, caused by Prue's negligence the incompetency.

The collision occurred about noon of a clear day. The wagon was in view of Prue for a mile or more before he collided with it. There is a cross-road which comes into Highway No. 40 from the south about an eighth of a mile east of the point of the collision. The road can be seen plainly for a mile or more by a person approaching from the west in an automobile. Highway No. 40 is paved with an eighteen-foot slab with dirt shoulders on each side. The tank-wagon and the mules were being driven partly off of the paved portion of the highway and partly on the dirt shoulder to the south. As the tank-wagon was thus proceeding eastwardly a Model T Ford pickup truck turned west into the highway from the cross-road and proceeded westwardly along the north side of the highway. The truck and tank-wagon passed each other about an eighth of a mile west of the cross-road and, as they passed, there was at least ten feet of space between the two vehicles.

The driver of the truck, testifying for plaintiff, stated that the car being driven by Prue approached the tank-wagon at a rate of speed of about forty or forty-five miles per hour, sounding no horn, and upon the south side of the road; that when his truck was twenty-five or thirty feet west of the tank-wagon the latter was violently run into from the rear by the Chevrolet car being driven by Prue; that he saw the collision through his rear vision mirror; that the right front fender of the Chevrolet struck the left hind wheel of the wagon, the tank-wagon and mules being thrown into the ditch on the south side of the road; that the combined length of the mules and the wagon was about twenty-six to thirty feet and that the Chevrolet stopped eight or ten feet ahead of the mules; that the Chevrolet was stopped headed east partly on and partly off of the pavement; that the witness was proceeding at a rate of speed of about twenty or twenty-five miles per hour; that he did not see the Chevrolet start around the tank-wagon until the witness had passed it, at which time the Chevrolet "started to go around."

The circumstances, under which the Chevrolet car was intrusted to Prue by the defendant, DeWitt Chevrolet Company, are as follows:

The company was a dealer in new and used automobiles, with its place of business located on 15th Street in Kansas City. Mr. Ben Thurman was its authorized agent and salesman. Mr. Jenkins was its sales-manager. For about two weeks prior to July 19, 1934, Mr. Thurman had been trying to interest Mr. Prue, who lived in Kansas City, in the purchase of a new 1934 Chevrolet automobile and, as a part of his solicitation, urged him to take such a car out and drive it and show it to his family. Mr. Prue owned a 1925 Model T Ford car and a 1925 Chevrolet and was interested in buying a new Chevrolet. During the solicitation by Mr. Thurman Mr. Prue did not ride in the car. It was used by Mr. Thurman as a demonstrator and was practically a new car. Mr. Prue had never been in a 1934 Chevrolet car. It was a six cylinder car and Prue had never driven such a car. Prue had owned, for about three years, a summer cottage on Tarsney Lakes, located about twenty-eight miles from his home in Kansas City. He and his family customarily visited the cottage about once every week in the summer time. The Model T. Ford had but one seat and could not accommodate the family, so the family used Prue's 1925 Chevrolet car, at least a part of the time, in making these trips, the car being driven by other members of his family and not Prue. His family had been taken to the summer cottage by his son-in-law the day before the collision and Prue, on the day in question, had intended to use his 1925 Chevrolet, driving it himself, to bring them back.

However, it was not running to suit him and, after attempting to adjust it, he decided to avail himself of the invitation of Mr. Thurman to use the demonstrator. He called up Mr. Thurman and asked him if he could use the 1934 Chevrolet, for the purpose we have stated, and receiving a favorable reply, he drove his 1925 Chevrolet to the place of business of the defendant, DeWitt Chevrolet Company, and there parked it and gave Mr. Thurman the keys. Mr. Thurman then turned over to Prue the 1934 Chevrolet involved in the collision.

Prue was called as a witness for the plaintiff. He testified that he had been driving Model T Fords beginning with the year 1917 and had owned three of them; that he purchased the 1925 Chevrolet new but that he had not driven it over five or six times, and not more than 200 miles prior to the collision; that his son, who lived with him, owned a 1929 Chevrolet and that the title to his son's car was carried in the witness' name because his son was not of age; that he had ridden in his son's car but had never driven it; that his son sold it three or four years before the trial, which was had on September 25, 1939; that, when he arrived at the place of business of the DeWitt Chevrolet Company, he saw Mr. Thurman, who called Mr. Jenkins, the sales-manager, and introduced him to the witness; that the conversation between them occurred in Mr. Jenkins' presence. Jenkins did not testify.

In reference to the conversation had with Mr. Thurman, when the witness called to get the 1934 Chevrolet car, on direct examination, the witness was asked: "Q. And what, if anything, did you say to him (Thurman) about your experience in driving a Chevrolet? A. Well, I told him that all I had ever driven was a Model T Ford. He asked me if I had ever driven a gear-shift car and I told him not to amount to anything, . . . very little. . . . Q. Did you say anything to him about not being acquainted with the controls? A. Yes, sir. Q. What did you say to him about that? A. Well, when he got the car out of the parking station and brought it out there and I got in it, he stopped the engine and I was going to start it, and I said, 'Where is your starter on here?' Well, he told me it was automatic controlled. I told him I had better not take this car, 'I am not familiar with it.' He said to go ahead and take it, 'You will make it all right.' "

The witness further testified that he had never been in that kind of a car; that he had never before driven a six cylinder car; that his Ford and Chevrolet were four cylinder cars. He further testified: "Where was that place where you would put your foot in relation to where the brake pedal is on a Ford? A. Well, it was in a different position than it was on a Ford;" that the starter button on the Ford "was on the floor, right in front of the seat;" that the 1934 Chevrolet was started by what "they" called the "automatic control;" that the starter "was down in there with the gas feed, on the pedal."

On cross-examination he testified: "Q. Now, I believe you said this car was started different from your car? A. Yes, sir. Q. And that was the only thing about the car that you didn't understand, the starting of it, is that right? A. Yes, sir. Q. You didn't have any doubt about your ability or competency to drive the car except the starting mechanism, isn't that right? A. Yes, sir. Q. And it was the starting mechanism that you called Mr. Thurman's attention to and said you didn't understand? A. I didn't want to take the car out. Q. Because of the starting mechanism, is that right, the starting of the car? A. Yes, sir. Q. Now, when you speak about the automatic control with which this car was equipped, I mean this 1934 Chevrolet, you are referring to the mechanism that starts the car? A. Yes, sir. Q. That is what you have referred to. Mr. Thurman told you, explained to you how to start this car with this automatic control, did he not? A. Yes, sir. Q. When you hesitated to take the car, as you stated, what you were afraid of, as you stated, was that you would get the car out in the country somewhere and wouldn't be able to get it started? . . . A. That is it exactly. Q. And you did start out driving the car out to Tarsney Lakes? A. Yes, got along all right with it because I didn't have to stop, that is, kill the motor. Q. You didn't have to start it, you didn't kill the motor and you didn't have to start it? A. It was run-

ning when I left. Q. And your only fear, of course, was the starting of the car. A. Yes. I wasn't bothered with that any at all, you see, because after I started here the motor was still running until we had the accident.''

Prue further testified that there was a difference in the operation of a 1925 Model T Ford car and a 1934 Chevrolet; that the Model T was operated by three pedals; that the left pedal, when in middle position, caused the car to be in neutral and when pressed all the way down it put the car into low speed and when allowed to come all the way back it put the car in high speed; that the middle pedal was to put the car in reverse; that the right hand pedal was the foot brake; that there was no gear-shift lever and the gas feed lever, which controlled the speed, was underneath the steering wheel and was operated by hand; that it had four cylinders, and developed about twenty horsepower; that it made considerable vibration and noise when in operation; that its maximum speed was about twenty-five miles per hour; that his 1925 Chevrolet and standard gear-shift but had no foot throttle; that the gas supply was controlled by a hand gas lever; that it was capable of running about thirty miles per hour; that it also made a great deal of noise and vibration.

There was other evidence that the 1934 Chevrolet was a gear-shift car with three pedals on the floor, the left one being the clutch, the center one being the foot brake and the right hand one being the gas feed, which controlled the speed of the car, and which was also the starter; that the car was easily capable of running at a rate of speed of eighty or eighty-five miles per hour; that it was 800 pounds heavier than his 1925 Chevrolet; that it ran without any noise or vibration and had a quick pickup; that the rate of acceleration of the 1934 Chevrolet was thirty to fifty per cent more rapid than his 1925 Chevrolet; that from a standing start, the 1934 Chevrolet could be going thirty to thirty-five miles per hour in a space of 100 feet, whereas the 1925 Chevrolet would be going only fifteen or twenty miles per hour; that the difference in acceleration was such that if both started from a standing start the 1934 Chevrolet would go one block while the 1925 Chevrolet was going a half block; that the 1925 Ford was even slower than the 1925 Chevrolet.

Mr. Thurman, testifying for the defendant, stated: ''Q. Now, you knew, of course, that the old gentleman had never been in one of these new cars, did you not? A. He spoke of that. Q. And did he tell you that he wasn't used to driving these new cars? A. He didn't specify it that way at all. He just spoke that he had never driven one of the late cars. Q. What explanation did you give him of them? A. I just told him that he could find that it handled much easier than the old type, which it did. Q. You didn't have to pull so hard on it to steer it? A. That is right. Q. Did it run a

great deal faster? A. It would. Q. And it didn't make much noise or vibration, did it? A. No, sir."

Plaintiff testified that he drove the 1934 Chevrolet eastwardly on 15th Street; that he made a stop at a stop-light at 15th and Jackson Streets; that he drove from there to Independence, where he turned south on to Noland Road to go to Highway No. 40; that on Noland Road "I noticed the speedometer was crawling up on me and I thought there was something wrong with it. Q. How high was the speedometer when you noticed it? A. It was a little better than sixty. Q. And you thought the speedometer wasn't working right, is that it? A. Yes, sir. Q. Then you applied the brakes and the speedometer went down; didn't you? A. Yes, I thought there was something wrong with it and I commenced slowing up a little. Q. What did you commence to do? A. Slowing up. Q. You say you commenced slowing up to test the speedometer? Just tell these gentlemen what you did. A. It was coming back then. Q. Well, you applied the brakes to see if it would drop the speedometer, didn't you? A. Yes, sir. Q. And the speedometer did drop? A. Yes, sir. Q. And how low did it drop there at that place before you got to Highway No. 40? A. Dropped down to about ten or fifteen miles. Q. You were satisfied the speedometer was working all right then? A. I seen it was;" that when he reached Highway No. 40 he slowed up, by applying the brakes; that he turned south into the highway at the rate of speed of about five miles per hour; that he first noticed the tank-wagon when he was about a half a mile from it; that as he approached it he judged he was driving at the rate of speed of about forty or forty-five miles per hour; that he did not look at the speedometer. "Q. But your judgment, from driving a car for many years, seventeen years at that time, was that you were going forty to forty-five miles an hour as you approached the rear end of this water wagon? A. Yes, sir. Q. Now, when you were going sixty-five miles back there on Noland Road, you at that time thought you were going only about forty miles an hour, didn't you? A. That is about what I thought. Q. That is why you thought the speedometer wasn't working right? A. Yes, sir;" that when he was about 150 feet from the rear end of the wagon he made a turn to the left in order to go around it; that he did not see the Ford truck approaching; that he did not see it because it was being driven on the south side of the road in front of the wagon and the mules; that just before he started to turn "everything was clear as could be. There wasn't a thing in sight. . . . When I got up pretty close to this wagon on the side there, then this other car poped out in front of the team of mules;" that the first time he saw the westbound truck it was about thirty-five or forty feet in front of the automobile he was driving; that he was then going at the rate of speed of about forty-five miles per hour and when he saw the truck he turned his car to the right: "I tried

to keep from hitting either one of them;" that he pressed down upon the foot brake and the clutch at the same time and his right front fender or bumper struck the left rear wheel of the water wagon; that the wagon was pushed off of the highway and his car went about twenty-five or thirty feet before he was able to stop it.

At another place in his testimony he said he was about 150 feet behind the wagon when he tried to put on his brakes; that he tried to stop the car by putting his right foot on the brake pedal; that he pushed it "clear down to the floor-board" with all of the strength he had and that he "Must have went fifty or seventy-five feet before I got it stopped;" that he proceeded beyond the tank-wagon before his car stopped.

Plaintiff insists that the court erred in granting the defendant, De-Witt Chevrolet Company, a new trial for the reason that it negligently intrusted the automobile in question to Prue when it knew, or by the exercise of ordinary care, should have known that Prue was not qualified to drive the car.

The general rule is to the effect that in both bailments for gratuitous use and in lettings for hire, the bailor cannot be held responsible to a third person for injuries resulting from the bailee's negligent use of the bailed chattel. This applies to the bailment of automobiles. [6 Am. Juris., p. 396; Drake v. Rowan, 272 S. W. 101; Allen v. Coglizer, 208 S. W. 102; Tourkakis v. Billman, 71 S. W. (2d) 1084.] An exception to the general rule has been acknowledged to exist, where the bailor, himself, has been negligent in intrusting a dangerous article to one whom he knows to be unfamiliar with its dangerous quality, uninstructed in its use, or incompetent to use due care. This exception is now recognized where such bailment is a machine, such as an automobile or other instrumentality, not necessarily dangerous *per se*, but the use of which, for the purpose contemplated by the parties, will in all likelihood result in injuries to third persons unless operated with skill and judgment by a competent person in full possession of his faculties, "where the thing bailed is of this nature, and if at the time of the bailment the bailor knows, or ought to know, that the bailee is not so reckless, incompetent, or unsafe a person to operate such an instrumentality that danger to third persons will be a reasonably probable consequence of such operation, he may be held liable in damages for negligent injuries to strangers which occur as a proximate result of such incompetence or recklessness. The liability in such a case does not rest upon ownership or agency, but upon the combined negligence of the bailor and the bailee—negligence of the bailor in intrusting the instrumentality to an incompetent bailee, and the negligence of the bailee due to such incompetency." [6 Am. Juris., pp. 397, 398, 399; 8 C. J. S., p. 318; 42 C. J., pp. 1078, 1079, 1115; Daily v. Maxwell, 152 Mo. App. 415; Roark v. Stone, 30 S. W. (2d) 647; State ex rel. v. Harris, 77 S. W. (2d) 846.]

However, one hiring a chattel impliedly represents himself as competent to operate it (6 Am. Juris., p. 353; Edlof v. Waterson, 258 Pac. 201), and there is no duty upon the bailor of a vehicle, such as an automobile, to ascertain the competency and skill of the bailee, before intrusting it to the latter, in the absence of knowledge of the former of incompetency on the part of the bailee, or facts imposing some duty of inquiry. [Neubrand v. Kraft, 169 Iowa, 444; 6 Am. Juris., p. 399.]

There is little controversy between the parties as to the law applicable to cases of this kind, but they do not agree as to the facts disclosed by the record, and the inferences to be drawn therefrom. This has necessitated us setting out the facts in considerable detail.

The term "incompetent person," generally speaking, includes the term "inexperienced person." However, due to the fact that few cases of this kind involve inexperience alone the courts, in defining the term "incompetent person," do not usually have in mind an inexperienced person. For instance, in Davis v. Shaw (La.), 142 So. 301, 306, it is said: "The term 'incompetent person' as used by the courts generally we take to mean incompetent from physical or mental ability and impairment such as is found in children of tender age and physical weakness, insane persons, blind or crippled persons, and persons whose mental or physical qualities are so impaired normally by alcoholic or other intoxicants that they are incapable or incompetent of properly operating a motor vehicle."

Prue was not an incompetent person under this description of the term. There was no evidence that ever before had he driven recklessly or without prudence. There was no evidence that he had ever been in an automobile accident of any kind. So, if he was not qualified to drive the car in question, it was because of inexperience, solely.

It seems apparent to us that it was necessary for plaintiff to prove three things in order to hold the defendant, DeWitt Chevrolet Company, liable in this case: (1) That Prue was not sufficiently experienced to drive the automobile in question: (2) That the DeWitt Chevrolet Company knew or should have known of his lack of qualification in this respect: (3) That his inexperience contributed to the collision as one of its proximate causes.

It is quite apparent that Prue had had considerable experience in driving automobiles. He had owned three Model T Fords and one 1925 Chevrolet and had driven such cars for seventeen years before the collision. He had ridden in automobiles when he was not driving them. In no sense can he be likened to a person who had no knowledge of automobiles or their mechanism. So the matter narrows down to the question as to whether there was sufficient difference between the cars that he was accustomed to driving and the one involved in the collision to render him unqualified to drive the latter, and this involves his lack of familiarity with those controls on the 1934 Chevrolet,

which were different from those upon the Fords and 1925 Chevrolet which he was familiar with. It is true, he had had very little experience in driving his 1925 Chevrolet. However, he had owned it for nine years before the collision and had ridden in it over this period of time and there is nothing in the evidence to show that he had ever had any trouble in the driving of that car, or that he was not qualified in any respect to operate it. It had at least one thing in common with the one involved in the accident, which was not applicable to the Ford, and that is, that both had a standard gear-shift.

Taking Prue's testimony, as a whole, and leaving out some inferences that we will hereinafter refer to, it shows that the only part of the equipment of the 1934 Chevrolet, he lacked the ability to operate, when he called for it, was the automatic control or starting mechanism. In one part of his testimony, he stated: "Well, he (Mr. Thurman) told me it was automatic controlled, and I told him I had better not take the car, I am not familiar with it." However, it will be noted that he did not state, at that time, why he thought he had better not take the car and in what respects his lack of familiarity with it caused him to come to that conclusion (unless it can be inferred it was because of the automatic control.) Later on he explained the matter in such a way as to leave no question as to what he meant by saying that he had no doubt about his competency to drive the car, except as to the starting mechanism, and that he hesitated to take the car because he was afraid he would get it out in the country and would not be able to get it started; that Mr. Thurman explained to him how to start the car with the automatic control and that the witness was not bothered about it any more. "The mere fact that a driver to whom a car is hired is not familiar with the particular make of car hired does not show negligence on the part of the owner, the hirer being familiar with the operation of other makes and having received reasonable instructions as to how to operate the car leased to him. [5 Blashfield, Cyc. of Auto. Law and Prac., p. 59. See, also, Neubrand v. Kraft, *supra*.] In addition to this, of course, Prue's ability to start the motor with the automatic control did not contribute in any way to the collision.

However, in considering the question of the demurrer to the evidence, plaintiff is not only entitled to all of the evidence taken in its most favorable light to him, but to all inferences that reasonably may be drawn therefrom (Cech v. Chemical Co., 323 Mo. 601; Parker v. Nelson Grain & Milling Co., 330 Mo. 95), and notwithstanding Prue's testimony, to the effect, that his lack of qualification to drive the 1934 Chevrolet only went to the matter of the starting apparatus, it may be that the jury could have inferred that this car was so different from those that he had theretofore driven he was not acquainted with it sufficiently to understand its mechanism, in all essential respects, and that Thurman, having been told by the plaintiff

the extent of his experience in driving cars, that is, that he had only driven Model T. Fords, and a 1925 Chevrolet to a very little extent, Thurman and Jenkins were negligent in permiting him to take it.

Plaintiff says much, in general terms, relative to the incompetency of Prue to drive the car involved in the collision. But, specifically, his contention in this respect may be narrowed down to two or three matters, which plaintiff states contributed to the collision. In this connection plaintiff says that the Model T Fords which Prue had owned were not gear-shift cars, but were worked by three foot pedals; that the left pedal controlled high, low and neutral and the center pedal was the reverse; that the right pedal was the foot brake; that the corresponding pedals on the 1934 Chevrolet were the left for the clutch, center for the foot brake and the right for the gas feed or accelerator, so that if a driver, accustomed to putting his foot on the extreme right pedal on a Model T as the foot brake, put his foot on the extreme right of the 1934 Chevrolet, he would put it on the gas feed or accelerator instead of on the brake.

In this connection, plaintiff says there is sufficient from the evidence for the jury to infer that when Prue said he put his foot upon the brake immediately before the collision he actually put it upon the accelerator.

Next plaintiff contends that the maximum speed of the 1925 Model T Ford was only about twenty-five miles per hour and at that rate of speed the latter would vibrate a good deal. (We may say here we think there is an inference to be drawn from the testimony that Prue's 1925 Ford was not equipped with a speedometer, but that he judged the rate of speed it was going, when he drove it, largely by the vibration and noise it made.) Plaintiff further points out that the rate of speed of the Ford was controlled by a gas lever located underneath the steering wheel and operated by hand; that the gas control on the 1925 Chevrolet was similar in character and not like that on the car involved in the collision; that the maximum speed of the 1925 Chevrolet was about thirty miles per hour; that it also rattled a great deal; that Prue "owned and drove a 1925 Model T Ford and practically speaking his experience was exclusively confined to driving that type car. . . . It is a matter of common and universal knowledge, and an automobile dealer must be presumed to have known that in the nine years from 1925 to 1934 tremedous advancements were made in automotive design and engineering, so that greater speed, greater power, faster acceleration, less vibration and smoother operation were achieved every year, with the result that the high-powered car of 1934 bore very little resemblance to the anicent 1925 models. The 1934 Chevrolet turned over to Prue was easily capable of going eighty to eighty-five miles per hour, which was three to four times as fast as the old Model T Prue was familiar with, and at a very high speed it ran without noise or vibration. It was 800 pounds

heavier than the 1925 Chevrolet. The rate of acceleration was thirty to fifty times per cent greater.''

It is implicit in this quoted statement of plaintiff that the 1934 Chevrolet was an improvement over the old cars in its moveability and facility of control and, in fact, there was direct and uncontradicted evidence of these improvements. It was an easier car to handle than any Prue had been accustomed to driving. Prue testified rather freely as to the difference in these cars showing his familiarity with all of them, at least at the time of the trial. There is nothing to show that his knowledge of the 1934 Chevrolet was any different in scope at the time of the trial than it was at the time of the collision.

There is no evidence or inference to be drawn from the evidence, that Prue put his foot upon the accelerator instead of the brake when he said he used the latter and to say that he did would be indulging in mere speculation and conjecture. He testified quite explicitly that he put his foot on the brake and there is no contradiction in the evidence as to this fact. There is no evidence that the car picked up speed as he did so, which it would have done had he stepped on the accelerator, and if he had done this the car would have gone on down the hill instead of having stopped. The evidence shows that the car was not seriously damaged by the collision and was driven afterwards much during the day, and there is no evidence that he stopped, immediately after the collision, save as a result of its brakes being applied.

Plaintiff is entitled to all reasonable inferences that may be drawn from the evidence but he cannot be given the benefit of forced or unreasonable inferences and, he is not entitled to recover except upon substantial evidence. The view that a scintilla or modicum of evidence requires a submission of a case to the jury is not the rule in this State. [Grange v. C. & E. I. Ry. Co., 69 S. W. (2d) 955, 961; Van Raalte v. v. Graff, 253 S. W. 220; Bushman v. Barlow, 292 S. W. 1039, 1048, 1049.]

Plaintiff contends, in effect, that Prue was not qualified to drive the automobile involved in the collision because of his inexperience based upon the fact that he was deceived in the speed which the car was capable of developing and was making at the time of the collision. It is true that the car accelerated more rapidly than the cars Prue was familiar with and had less vibration and was also smoother in operation and could attain a higher rate of speed. There is evidence that when he was on Noland Road he was deceived by the speed at which the car was going. The speedometer indicated that the speed was sixty-five miles per hour, but he slowed the car down and found that the speedometer was working properly, and there is no evidence to the contrary. Therefore, at the time of the collision, he was familiar with this characteristic of the car as distinguished from those he had driven and knew that he could not judge of its speed in the same

manner in which he had judged of the speed of his old cars. He testified that he did not look at the speedometer as he approached the tank-wagon. But the evidence shows that he made a good estimate of this speed, as it agrees with that of the driver of the Model T truck that was passing. Even assuming that the rate of speed contributed to the collision, as one of its proximate causes, the collision was due in this respect to the fact that Prue failed to observe the speedometer, which was pure negligence on his part, and an act that could not reasonably have been anticipated by the DeWitt Chevrolet Company. A child, much less an adult, who is accustomed to riding in, much less driving, an automobile, knows enough to look at the speedometer to ascertain the rate of speed of a car in which he is riding. It took no extended experience, and it required no enlightment or instruction by Thurman for Prue to have known and done that. The agents of the DeWitt Chevrolet Company reasonably could have assumed that Prue would have used the speedometer to judge the rate of speed he was going at any particular time in his journey. He knew he was not driving a Model T Ford or a 1925 Chevrolet and he had driven the 1934 Chevrolet for at least thirty minutes before the collision and knew that it ran smoothly and did not vibrate or rattle like his old cars. He was familiar enough with the car he was driving to know it was not the same kind of a car as the cars that he had been accustomed to relative to acceleration and running ability. If he had not been negligent he would have taken account of this fact and watched the speedometer, which he failed to do.

However, it is said that Prue was an elderly man, the evidence showing that he was fifty-eight years of age at the time; that he was hard of hearing and did not have good eyesight and, that naturally his mental reaction and muscular responses would have been greatly slowed down.

The evidence, relative to his being hard of hearing and not having good eyesight, is not as stated by the plaintiff. He testified, at the time of the trial, which was more than five years after the collision, that he "was hard of hearing." There is no evidence as to the condition of his hearing at the time of the collision. He also said, at the time of the trial, that he could not see well, and had lost the sight of one eye. But it was further developed that he had lost the sight of the eye three years after the collision. The only testimony as to his eyesight at the time of the collision is "It wasn't extra good." But, whatever may have been the condition of his eyesight and his hearing, at the time of the collision, there is no evidence that the agents of the DeWitt Chevrolet Company were aware of any defect therein. There is no evidence that the agents of the DeWitt Chevrolet Company knew Prue's age. But, assuming that they should have known it from his appearance, the intrusting of an automobile to a man fifty-eight years of age would not, of itself, constitute negligence.

As reflecting upon Prue's incompetency, or lack of experience, to drive the car involved in the collision, plaintiff calls our attention to the testimony of one of plaintiff's witnesses, who stated that, after the collision, Prue entered the car and attempted to turn it around but that he could not do so, and that the car was driven from the scene of the collision by another person. There was evidence, unobjected to, that it was driven away by that person at the request of Prue. There is no evidence in the record, binding upon the defendant, DeWitt Chevrolet Company, tending to show that Prue was unable, by lack of experience in driving the car, to turn it around or drive it away. The only evidence that might be said to reflect upon this matter was that Prue was crying and was very nervous after the collision. It is true that there was testimony that Prue made some statements, after the accident, bearing upon his ability to drive the car, but these statements were admitted by the trial court as constituting admissions of Prue and, as such, competent as to him, a party defendant in the case, the court holding that they were incompetent as to the defendant, DeWitt Chevrolet Company. They were not a part of the *res gestae* and are not claimed to have been such by the plaintiff and, of course, the ruling of the court was a proper one. They cannot be considered by us in connection with the demurrer to the evidence.

Plaintiff attempts to make use, in this appeal, of certain statements made by Prue in a deposition taken before the trial. These were admissible in evidence because they constituted admissions of Prue and, as such, were competent as to him, but were incompetent as to the defendant, DeWitt Chevrolet Company. This is especially true as Prue was a witness at the trial and testified fully.

We have examined the cases cited by the plaintiff, which he claims are similar to the case at bar, as to the facts, and find them not in point. The facts stated in the opinion in the case of Greenie v. Nashua Buick Company (N. H.), 158 Atl. 817, relied upon by the plaintiff, are not set forth therein as fully as might be desired. They show that the defendant's agent, Tarbell, was teaching one, Peck, to drive a car that defendant had contracted to sell to Peck. Peck was seventy-four years old. He has had many years experience in driving a Ford car "with the old shifts" but had never operated a "gearshift" car and Tarbell, in reference to the car Peck was purchasing, gave him "just theoretical instructions as to changing a gear and the brakes and the like." Peck drove the car out of the garage with Tarbell in the seat. The car crossed the sidewalk but before the front end of it was in the center of the street plaintiff's car approached from the right and both Peck and Tarbell attempted to stop their car. When Peck undertook to put his foot on the brake he put his foot on the accelerator, thus causing the car to "leap" or "shoot" ahead, colliding with plaintiff's car. A recovery against

the defendant was upheld by the Supreme Court of New Hampshire but the mere statement of the facts in that case shows the marked difference between that one and the one now under review.

Being of the opinion that the court properly granted a new trial for the reasons assigned by it, the judgment should be affirmed, and it is so ordered. All concur.