Fern THOMASSON, Plaintiff-Respondent,

v.

Deso WINSETT, Administrator, Defendant-Appellant.

No. 7627.

Springfield Court of Appeals. Missouri.

Jan. 21, 1958.

Finch, Finch, & Knehans, Jack O. Knehans, James A. Cochrane, Jr., Cape Girardeau, for defendant-appellant.

Strom & Strom, Elmer A. Strom, Cape Girardeau, for plaintiff-respondent.

RUARK, Judge.

Jefferson Parker Thomasson was killed in a one-car automobile accident on January 22, 1955. Since the witnesses refer to him as Jeff, we will for convenience and brevity use that name. The plaintiff, who is mother of Jeff, recovered judgment against the estate of John Winsett, who was also killed in the accident.

The petition pleads that Jeff was born March 26, 1939, (thus making him a few days less than fifteen years and ten months old at the date of his death); that John Winsett was the owner of a Dodge automobile and did on various occasions prior

to the accident permit Jeff to drive such car; that Jeff was under sixteen, unlicensed, immature, untrained, and inexperienced, *all of which was known to Winsett;* that on the evening before the accident Winsett was drinking and that he willfully, wrongfully, and intentionally, and in wanton and reckless disregard of duty, did request or permit Jeff to drive the car, which left the road at a rapid rate of speed and struck a culvert; and both Jeff and Winsett were killed. The petition then charges that the death of Jeff was due to the wanton, willful, and reckless acts of Winsett in permitting Jeff to drive.

The facts are: On the evening in question Jeff and a friend, a youth named Gerald Englehart, met in Lutesville. Deceased John Winsett was in town, and they met him on the street. There ensued some talk between the two boys and Winsett, and apparently as a result of that conversation the boys, in Gerald's pickup, followed Winsett to a tavern-restaurant at Marble Hill, where the three stayed for about an hour. Winsett was drinking; in fact, he was intoxicated, but there is no evidence that the two boys did any drinking at that time. It was then decided that they would drive around. Gerald took his father's pickup home. Winsett climbed in the back seat of his own car and gave his keys to Jeff, who drove for the rest of the evening. Jeff, with Winsett in the back seat, first picked up Gerald at his home, and the trio, with Jeff driving, Gerald on the seat beside him and Winsett in the back seat, started first to Cape Girardeau; but the plans were changed and they decided to go to Mutt's Place, a truck stop in Advance, which is about sixteen miles from Lutesville, and "it didn't make any difference to him [Winsett]." On the way to Advance the car stopped once and Winsett got out and "throwed up some" and got back in the car. Before they reached Mutt's Place Winsett went to sleep, or surrendered consciousness, in the rear seat of his car and so remained for the remainder of the evening and until

he was killed. They arrived at Mutt's Place at 10:30 or 11:00. There the two boys met Jeff's older brother Wayne and a friend Sonny Schrock, who were eating. The four of them struck up some talk about going to St. Louis. While they were at Mutt's Place the boys went to the Schrock car and drank "a can of beer." After remaining at Mutt's Place for awhile Jeff drove the Winsett car back to the Thomasson (Jeff's) house in Lutesville, and the two boys went in for awhile. The purpose of stopping at Jeff's home was that the boys were planning to go to St. Louis with Wayne and Sonny and "we were scared they would come in and we couldn't catch them in time and afraid they might not or couldn't find us.". The boys then drove to what is called the Leopold Junction, which is three or four miles from Lutesville, and parked the car to wait for Wayne and Sonny. It was then a little after midnight and Winsett was still "out" in the back seat.

At about 2:00 a. m. Wayne and Sonny came from the direction of Advance, driving at a rate of about sixty m. p. h. Jeff pulled out and followed them for about a mile and a half. The cars started up a hill and Jeff decided to pass. He speeded up to what Gerald says was around eighty-five m. p. h. and went around, Wayne and Sonny, in the lead car, having allowed room on the left for him to do so. The passing was accomplished just after the cars had gone over the crest of the hill. From there the road was downhill with a gradual curve to the right. Just after it had passed the Schrock car, a left wheel of the car Jeff was driving went off the blacktop. He attempted to straighten the car out and get it back on the pavement but was unable to do so, and in the space of a pulse beat this swiftly moving carriage became a snarling chariot of death carrying two mortals into oblivion. It went down the ditch and struck a culvert in a "swag"; the occupants were thrown out. Winsett was killed instantly, and Jeff expired a short time later.

36

Plaintiff's instruction 1 submitted the proposition that Winsett intentionally permitted Jeff to drive when Jeff was under the age of sixteen and not the holder of a driver's license, when such (age and lack of license) was *known* to John Winsett; that Jeff was incompetent to drive the car; and that Winsett's acts were willful, wanton, and reckless, which terms were defined in the instruction. The jury returned a verdict for $5314.

The first and principal question is whether plaintiff made a submissible case of willful and wanton negligence.

■ Ordinarily an owner who surrenders his property to another is not liable for the acts of the bailee in his use of such property. An exception to this is that where one entrusts a dangerous instrumentality to an incompetent, inexperienced, or reckless person the bailor may become liable upon the theory that his misconduct or negligence in so entrusting the dangerous instrumentality combines with the misconduct or negligence of the bailee to produce the injury. An automobile is not a dangerous instrumentality as such, but it can become so when placed in the hands of an incompetent, inexperienced, or reckless person.[1]

■ Under section 302.060 RSMo 1949, V.A.M.S., no license shall be issued to an operator under sixteen years old, and under section 302.260, no person shall authorize or knowlingly permit a motor vehicle to be driven in violation of the preceding sections. These statutes are for the protection of the public [Dinger v. Burnham, 360 Mo. 465, 228 S.W.2d 696(6)], and a person under sixteen years of age must be taken as incompetent as

a matter of law. Therefore, the person who "knowingly permits" such driving by a person under the age of sixteen is negligent as a matter of law.[2]

■ In determining the question of *simple negligence in entrusting an automobile* to an incompetent or inexperienced person, considerable authority, including Missouri, holds that in order to charge the owner with such negligence there must be some knowledge of the incompetency, or circumstances which would provoke inquiry and investigation by a reasonable person.

Thus in Saunders v. Prue, 235 Mo.App. 1245, 151 S.W.2d 478, it was held that *knowledge* of the incompetency was a necessary link in the chain of liability and that one turning an automobile over to another was not charged with the duty to make investigation as to competency in the absence of some circumstance which would put a reasonable man on the alert.

In Lix v. Gastian, Mo.App., 261 S.W.2d 497, it is said, loc. cit. 500:

"The general rule is that the owner of an automobile is under a duty not to place the automobile in the hands of a person whom he knows, or in the exercise of reasonable diligence could have known, to be an incompetent, careless, reckless, or inexperienced driver."

And:

"And, the owner's knowledge of the driver's incompetence may be shown either by evidence that he in fact knew of such acts [specific acts of recklessness], or by evidence that the driver's incompetence was generally known in the community."[3]

1. 2 Restatement, Torts, sec. 390; Blashfield, Cyclopedia of Automobile Law and Practice, vol. 5, sec. 2924, p. 134; 100 A.L.R., annotation, 923, et seq.; 36 A.L.R., annotation, 1148; 60 C.J.S. Motor Vehicles § 431, p. 1057; Daily v. Maxwell, 152 Mo.App. 415, 133 S.W. 351.

2. Roark v. Stone, 224 Mo.App. 554, 30 S.W.2d 647; Dinger v. Burnham, 360 Mo. 465, 228 S.W.2d 696; see Ritchie v. Barton, Mo.App., 292 S.W.2d 599.

3. See also State ex rel. to Use of Leatherman v. Harris, 229 Mo.App. 304, 77 S.W.

 As to whether the owner, in letting his car to a person under sixteen years of age, can be charged with knowledge of incompetency on the theory that the statutes before mentioned create a positive duty to know, the Missouri courts have not found it necessary to say, because in each of the cases which declared that liability existed, knowledge was necessarily assumed from the circumstances. Without attempting to decide that question here, we do say it might well be that a person could be guilty of simple negligence and therefore be responsible for all of the injuries which flowed in natural sequence from his act, because of his failure to take into account the age of a driver, and yet not be guilty of conduct which was willful, wrongful, intentional, wanton, and reckless (which is the theory pleaded, tried, and submitted in this case) in turning the car over to an under-age driver.[4] Violation of a statute might be proof of negligence, yet not necessarily proof of wantonness.[5]

The courts have attempted many times to define willful and wanton and reckless conduct. In Nichols v. Bresnahan, 357 Mo. 1126, 212 S.W.2d 570, at loc. cit. 573, it is said:

"Negligence is one kind of tort, an unintentional injury usually predicated upon failure to observe a prescribed standard of care (52 Am.Jur., Sec. 20) while a willful, wanton, reckless injury is another kind of tort, an intentional injury often based upon an act done in utter disregard of the consequences. 52 Am.Jur., Secs. 22, 23; 38 Am.Jur., Secs. 4, 5. Reckless conduct may be negligent in that it is unreasonable but it is and must be something more than unreasonable, 'it must contain a risk of harm to others in excess of that necessary to make the conduct unreasonable and therefore, negligent.' 2 Restatement, Torts, p. 1294. 'The actor's (defendant's) conduct is in reckless disregard of the safety of another if he intentionally does an act * * * *knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him.'* 2 Restatement, Torts, secs. 500, 501."*

Brisboise v. Kansas City Public Service Co., Mo., 303 S.W.2d 619, 623, states that reckless conduct must involve *an easily perceptible danger, and the chance that it will result must be great.*

Stewart v. Farley, 364 Mo. 921, 269 S.W. 2d 896, 898, adopts the statement:

" 'Wantonness' or 'recklessness' within the rule means that the actor, here the plaintiff, 'has intentionally done an act which was of an unreasonable character, in disregard of *a risk known to him or so obvious that he must be taken to have been aware of it, which was so great as to make it highly probable that harm would follow.'* Prosser, Torts, p. 261."

In Harzfeld's, Inc., v. Otis Elevator Co., D.C.W.D.Mo., 116 F.Supp. 512, is an enlightening discussion of the question. It is said, loc. cit. 514:

2d 846, 848; 168 A.L.R. annotation, 1380; 60 C.J.S. Motor Vehicles § 431, p. 1057; Blashfield, Cyclopedia of Automobile Law and Practice, sec. 2924; Benton v. Griffith, La.App., 184 So. 371 (4); Roberts v. Hill, 240 N.C. 373, 82 S.E.2d 373(4).

4. Ortman v. Smith, 8 Cir., 198 F.2d 123 (5); Benton v. Sloss, Cal.App., 234 P.2d 749(5).

5. 38 Am.Jur., Negligence, sec. 158, p. 830; 65 C.J.S. Negligence § 9(2), p. 385; Gulf, Mobile & Ohio R. Co. v. Freund, 8 Cir., 183 F.2d 1005, 21 A.L.R.2d 729, 737; Higbee Co. v. Jackson, 101 Ohio St. 75, 128 N.E. 61, 14 A.L.R. 131.

* All italics in this opinion are our own emphasis unless otherwise indicated.

" 'Willful, wanton and reckless' conduct connotes some degree of wrongful, conscious intent. * * * 'A wanton act is a wrongful act done on purpose, or in malicious disregard of the rights of others. * * * As we understand the words "conscious disregard of the life and bodily safety," they add nothing to the words "willful, wanton, and reckless," and are included within the meaning of those words. As applied to an act, they necessarily mean that such act was intentionally done without regard to the rights of others, *and in full realization of the probable results thereof.*' " **

In Carrow v. Terminal R. Ass'n of St. Louis, Mo.App., 267 S.W.2d 373, 377, it is said that " * * * in the case of wilfulness or utter disregard of the consequences, the injury is said to be either actually or impliedly intentional."

In 38 Am.Jur., Negligence, sec. 48, p. 693, it is said that in wanton conduct there must be an intention to do an act with a reckless indifference to the injurious consequences which *will probably result therefrom,* and (p. 694) "will in all common probability result in injury."

█ In 65 C.J.S. Negligence § 9, p. 374, it is stated that willful injury will not be inferred when the result may be reasonably attributed to negligence or inattention; (p. 376) wantonness is a state of mind that includes the elements of consciousness of one's conduct and realization of the probability of injury to another, or reckless disregard of the consequences. (p. 380) Mere inattention does not amount to willfulness or wantonness. (p. 381) There must be *"consciousness that one's acts or omissions will probably result in injury to another,* for considered without reference to known, probable, or inevitable injury resulting, even the conscious or intentional omission

of any precautionary duty is no more than simple negligence."

Other courts, which have had more experience than we in dealing with this question because of guest statutes, have simplified the definition by holding that willful and wanton negligence implies knowledge *of the danger and is the intentional doing of something with knowledge that a serious injury is probable as distinguished from possible.*[6]

It will be seen from all the definitions that in order to fasten guilt as a willful, wanton, and reckless act there must be a tint, scent, and aura of *knowledge,* either actual or so strongly suggested by the circumstances that it would be apparent to a reasonable man, that injury will be the probable result following from the act performed. Our own thoughts on the subject are that before the deceased, Winsett, could be found guilty of willful, wanton, and reckless misconduct there must be evidence from which it could be found or inferred that he knew, or the circumstances were so strong as to charge him as a reasonable man with anticipating, that serious injury *would probably result* from his placing the automobile under the management of Jeff Thomasson.

█ In this case the knowledge (or the responsibility of knowledge) of likelihood and probability of resulting injury could come only from the fact that Jeff was incompetent to drive and that this incompetence was such as would likely (probably) lead to his injury. To be sure, one who entrusts his automobile to one who because of youth and immaturity is palpably incompetent to drive, as, for instance, to an eight-year-old child, would be charged with willful, wanton negligence, because the circumstances themselves would proclaim the danger and the probability of injury. But that is not the situation here,

---

** Emphasis placed by that court is not shown.

6. Mish v. Brockus, 97 Cal.App.2d 770,

218 P.2d 849 (2, 3); Ortman v. Smith, 8 Cir., 198 F.2d 123, 126; Graham v. Shilling, 133 Colo. 5, 291 P.2d 396.

for there is no evidence that the immaturity was apparent. There was no evidence that Winsett either actually knew Jeff was some two months less than sixteen years old or that he was an immature, inept, or reckless driver. The only evidence touching Jeff's physical and mental characteristics is that "he appeared to be a person of normal health and just normal physical characteristics." Also he was an athlete, "very strong," and an average or better student. In respect to his ineptness, or inability, he was not inexperienced, for it appears that he had previously driven both Winsett's automobile and the automobile of his brother Wayne on more than one occasion. The only direct evidence concerning Winsett's knowledge of Jeff's competency or incompetency came from the statement of a witness who testified that approximately a week before the accident he met Winsett on the street in Lutesville. Winsett was then sitting in the back seat and Jeff was under the wheel. At that time Winsett stated to the witness in a joking manner, "I have my chauffeur. He is my chauffeur," and that "he was a very good boy and he permitted him to drive under his supervision." We think the total of this evidence was insufficient to justify a jury in finding or inferring that Winsett was guilty of willful, wanton, and reckless conduct based on the fact that he knew, or that the danger of injury was so apparent that he as a reasonable man should have known, that injury was likely to result; and even though we assume (which we do not) that there are facts and circumstances from which it might be inferred that Winsett knew or should have known that Jeff was only fifteen years, nine months, and twenty-six days old instead of sixteen years plus one day, we would still conclude that the evidence in this case does not justify the inference of knowledge that serious injury would necessarily or probably (as distinguished from possibly) result as a consequence of Jeff's operation of the automobile on this occasion. We must judge the act of the deceased with regard to foresight and not by hindsight (Panke v. Shannon, 357 Mo. 1195, 212 S.W.2d 792), and we are of the opinion that foresight would not have told a reasonable man that serious injury was inevitable or probable.

It appears that the parties have put in all the evidence there was to be had on the issues here presented and that nothing could be accomplished by a remand for another trial. So saying, it becomes unnecessary to consider the other assignments of error, and the judgment of the circuit court is reversed. So ordered.

STONE, P. J., and McDOWELL, J., concur.

### On Motion for Rehearing

RUARK, Judge.

We have concluded that the rulings of the court, especially that made on objection to part of the plaintiff's opening statement outlining the case she expected to prove, may have misled or restrained the plaintiff in regard to the scope of proof concerning knowledge of incompetence. Respondent should have opportunity to develop this if she can, and for such reason the order of reversal is modified and the case is remanded for retrial. Motion for rehearing is denied and motion to transfer is overruled.

For the purpose of avoiding possible error on such retrial, we suggest that plaintiff's Instruction No. 3 was wholly abstract [see Patterson v. Thompson, Mo.App., 277 S.W.2d 314(16)] and is subject to the criticism that it is a comment.

Instruction No. 5, submitting the measure of damages, specifically called attention to the fact that Jeff might be subject to induction in the armed services. Spalding v. Robertson, 357 Mo. 37, 206 S.W.2d 517, 523, held that evidence in regard to induction was competent but disapproved of singling it out in an instruction.

We think we have heretofore said all that is necessary as to the definition of willful and wanton conduct. Assuming a submissible case is made, either party is entitled to an instruction defining such conduct. If one party gives such instruction but so limits it as to make it susceptible of jury interpretation that it applies only to the conduct of one person, then the other party is entitled to such an instruction which gives a definition not so limited.

STONE, P. J., and McDOWELL, J., concur.