**Dorothy Evelyn RITCHIE, a minor, by her guardian, Newton J. Ritchie, Plaintiff-Respondent,**

**v.**

**Virgil BURTON, Defendant-Appellant.**

**No. 7396.**

Springfield Court of Appeals.

Missouri.

June 7, 1956.

600

Burden & Shortridge, Joplin, for defendant-appellant.

Karl Blanchard, Seiler, Blanchard & Van Fleet, Joplin, for plaintiff-respondent.

RUARK, Judge.

Defendant's automobile, in which plaintiff was a guest, was confronted on a curve by an International pickup truck and attempted evasive action by going to the right. In so doing it went into the ditch, swerved a time or two and finally overturned. For resultant injuries the jury allowed plaintiff $7,500. A remittitur of $1,500 having been ordered and entered, motion for new trial was overruled and defendant has appealed.

Appellant's first assignment is aimed at the sufficiency of the evidence, and this, having been a jury-tried case, involves an examination of the evidence and reasonable inferences most favorable to the plaintiff. Prior to the events here concerned, defendant, Virgil Burton, had been courting Alta May Ritchie for approximately a month. His campaign terminated happily, for by trial date they were married. Some of the courtship was accomplished via Chevrolet, for Virgil had been, on various occasions, teaching Alta to drive. According to her testimony she had had some driving experience before; and she had progressed considerably under Virgil's tutelage. He said she was a "skillful" driver; but she

was his wife when he so testified, and a jury, knowing that it is impolitic for any husband to refer to his wife's driving ability as anything less than skillful, might have accepted his appraisal with some mental reservations. It is not amiss to say, however, that defendant had, during a part of his service in the army, the task of teaching others to drive and operate military equipment, so it could be concluded that he was not only competent to teach but qualified to judge the progress of those less experienced. When we say that Alta was over sixteen years old, and thus legally qualified as to age, but did not have an operator's license, we think we have sufficiently covered the capacities of the parties.

The locale of the accident was a curve on Highway 37, which appears to have been a highway in the sense of an old "county road" which had been blacktopped. The approach to the curve from the direction the Chevrolet was traveling is down a long and gradual grade. At the foot of the grade the road curves rather abruptly to the left (northerly). On the inside of the curve the ground is higher and covered with trees and rather thick brush. On the right somewhere near but south of the apex of the curve is a highway marker bearing the legend "one-lane bridge." This bridge, referred to in the evidence as White Oak bridge, is some 300 to 360 feet north of the marker. It is a narrow one-car span and sits considerably higher than the roadway, sufficiently so that vehicles approaching from opposite ends are not visible to each other. A rather steep fill or approach comes down off the south end of the bridge and shortly south of this approach (we having reversed our direction) the road begins its curve to the right. The bridge and its approach are aligned with the center of the road and an automobile coming off the approach is of necessity required to be in the center of the road. The roadway itself is blacktop 20 feet in width. The shoulder on the east or outer edge is negligible and the slope commences almost at the edge of the

blacktop and goes off gradually into a fairly shallow ditch. The curve is flat, that is, unbanked, and there appears to be a slight crown in the road. The defendant, who was familiar with the place, and a disinterested witness, Watts (of him more hereafter), identify this as a dangerous curve. Defendant said he knew of other accidents which had occurred at the place. So much for the locale.

On a bright December Sunday morning Virgil went to the home of Alta's parents, who live on a gravel county highway leading off Highway 37, intending to take Alta to Sunday school. It was agreed that plaintiff, Dorothy, who was Alta's little sister (age nine), might accompany them, and accordingly they set off. A half-mile down the road defendant decided to let Alta drive, and she got under the wheel. As to the positions of the others in the car there is conflict, for Dorothy says that after the change she, Dorothy, was in the middle and Virgil was on the right; while Virgil says he was in the middle and Dorothy was on the right. Alta does not say. After coming to Highway 37 Alta turned to the right and drove for more than a quarter-mile downgrade in an approach to the curve which we have described. As she got to or upon the curve or curve entrance she was going (depending upon which estimate is accepted) somewhere around 20–40 miles per hour and had let up on the gas pedal. In rounding the curve she was confronted by the pickup truck coming squarely up the center of the road from the direction of the bridge. She pulled to the right as far as she felt she could, to the approximate edge of the blacktop, and asked Virgil to take over. This he did by crowding over on the seat to the left, taking the wheel in his hands and putting his foot on the brake. Virgil, according to his testimony, drove for about 20 feet further along the right edge of the pavement, then went into the ditch. A tire mark showed where the Chevrolet left the road and continued to where it came to rest 138 feet to the north. The Chevrolet concluded its run by turning over to its left onto the

pavement and sliding along on its top. The pickup apparently did not give ground, did not stop, and continued serenely on its way; and while its driver appears to have been discovered by the highway patrolman, neither plaintiff nor defendant saw fit to call him as a witness. Both Alta and Dorothy say that they are unable to relate the events after the approach to the curve and the appearance of the pickup. On this occasion one Claude Evan Watts was visiting his brother-in-law, who lived on a hill immediately south and east of the curve. This home, like all proper Southern Missouri homesteads, included that useful structure perhaps not familiar to the present generation of city folk but which, if they do know it, is probably described by them as a rest room, whereas we who are more familiar with such things refer to this cabinet d'aisance as "the back house." But by whatever name it may be known, that is where Watts was headed when his preoccupations of the moment were interrupted by the squeal and scream of tires. He looked; the pickup was in the center of the road; the vehicles were "close together" as they passed and he could not tell whether the automobile or truck was going faster. A cloud of dust swirled into the air. Through it he observed the automobile as it went up the ditch, swerving two or three times as it went. He saw it overturn and skitter along on its top; another accident had happened at White Oak bridge. And these are the facts as the jury had them.

■ Defendant, having dominance over the operation of the car, was approaching the curve, which he knew to be sharp, unbanked and dangerous. He knew the view was obstructed and foreshortened. He knew a vehicle coming off the bridge on the other side of the curve would for some distance necessarily be traveling in the center of the road. The highway marker was an additional warning. The speed of the automobile under his control is a matter of estimates ranging from 20 miles per hour upward. A patrolman,

testifying from his report, without objection, gave the speed of the Chevrolet at 40 miles per hour and the speed of the pickup at 20 miles per hour, although how he got this information is not shown. The scream of the tires as described by Watts and the distance the Chevrolet traveled prior to the time it came to rest, the fact it swerved from side to side in the course of its travel, even the resultant damage to the car ($1,200), all were factors which the jury could have considered in determining whether the speed of defendant's car was in excess of that which a person in the exercise of the highest degree of care would use. Whether a given miles per hour is excessive must be determined from the surrounding facts and circumstances.[1] Coupled with the question of speed was that of lack of proper control, which could apply both to the time immediately prior to the sighting of the pickup and the subsequent attempt to operate the car from an awkward position on the seat to the right of the wheel, also the applied method of operation in failing to press the brakes and in pulling still further to the right. Virgil said the truck was 75 feet away when he saw it. He estimated he could have stopped his car in 30 feet but did not apply the brake because he thought the truck would hit him. The truck was straddling what would have been the center line if there had been one, and even the remaining width of the road to the east of it was subject to a conclusion by the jury that defendant may have incorrectly calculated his open and available passing space and that he took to the ditch unnecessarily. Also there is the question of proper lookout. Defendant says that Alta, his alter ego, who was sitting to the left and nearer to the inside of the curve, saw the approaching pickup before he did. He said his delay in seeing was caused by the glare of the sun; but the jury may well have disbelieved his explanation. All these things, the speed, the question of proper lookout and proper control, were things to be considered in relation to each other (they were submitted in the conjunctive); for the failure or partial failure to exercise the proper care in respect to one necessarily increased the duty owed in respect to the others. We are of the opinion that the plaintiff made a submissible case and hold against appellant on this point.

Appellant's second assignment is directed at plaintiff's instructions 2 and 4. The contention is that plaintiff (a) submitted a theory not pleaded and beyond the scope of the petition; (b) ignored a portion of the evidence; (c) assumed that since Alta was driving as a pupil she was unqualified, and imputed negligence to the defendant without hypothesization; (d) gave undue prominence to certain evidence; (e) submitted repugnant grounds of liability; (f) submitted acts of negligence not supported by evidence.

The petition was filed against both Virgil and Alta but immediately prior to trial was dismissed as to Alta. Paragraph 3 stated:

"(a) That immediately prior to the time the said Virgil Burton was teaching Alta Burton how to drive the said automobile, and that as the said automobile approached the point where it turned over, *the said Alta Burton and Virgil Burton negligently and carelessly exchanged control* of the said automobile while said automobile was still moving, and that as the said defendants were exchanging control of the car they lost control of the said car and it turned over."

Thereafter in separate subparagraphs the petition charged negligence in regard to excessive speed, failure to have the automobile under proper control, failure to keep a lookout and negligence in swerving off the road.

---

1. Chenoweth v. McBurney, 359 Mo. 890, 224 S.W.2d 114; Bear v. Devore, Mo. App., 177 S.W.2d 674; Windsor v. McKee, Mo.App., 22 S.W.2d 65.

In plaintiff's opening statement counsel stated that Alta did not know how to drive or was just learning to drive and Virgil was teaching her; that she did not have an operator's license and Virgil knew it. Defendant objected to this for two reasons, because there was nothing alleged in the petition as to her being incompetent as a driver nor as to negligence on the part of Virgil in permitting her to drive when she did not have a license. In the colloquy which followed, plaintiff's counsel told the court that no "violation" was pleaded but that one of the allegations was that the drivers exchanged control while the car was moving. "We are just getting into how he happened to be driving the car on that date. It is a violation, as a matter of fact, to allow an unauthorized person to drive a car. That goes to the fact of negligence in allowing her to drive the car." The court indicated that such an allegation would have to be pleaded and plaintiff's counsel stated, "That is not the reason for it. After they have started talking about emergency, this was created by Virgil Burton." The court sustained the objection. Later, not in the presence of the jury, plaintiff offered to show as an admission against interest that Virgil had stated that he knew Alta did not have a driver's license. To this defendant objected because it was beyond the scope of the pleadings, irrelevant, immaterial and prejudicial, which objection the court sustained. Later in the course of the trial plaintiff's counsel asked defendant *if he did not know that before a driver could operate a car he had to have a driver's license.* To this defendant objected and the court sustained the objection. Plaintiff then offered to prove that the witness would answer "yes," that Alta May did not have a Missouri driver's license at the time of the accident *and at the previous times when he had been teaching her to drive the car.* Still further in the course of trial defendant's counsel asked Alta if she had had any driving experience prior to the time she had met Virgil. At this point plaintiff's counsel interposed and requested permission to ask a preliminary question to lay ground for an objection. Permission being granted, he then asked Alta *if she had ever obtained a driver's license.* To this defendant objected and moved for a mistrial. The court, after having indicated that the fact she had a license might have a tendency to show whether or not she was experienced, sustained defendant's objection but did not rule on the motion for mistrial. During the colloquy, which was apparently in the presence of the jury, it was remarked by plaintiff's counsel that it is not competent for a girl who didn't have a driver's license to pose as an expert driver, which they are attempting to do." Thereafter and out of the presence of the jury plaintiff renewed the offer to permit the defendant to answer that she did not have a license at the time of the accident.

Plaintiff's instruction number 2 was to the effect that if Virgil was the owner and if Alta was driving the car *as a pupil of defendant in learning how to drive,* then Virgil would be legally liable for the negligent acts or omissions of Alta in driving; that if on December 28 Alta was driving defendant's Chevrolet along Highway 37 *as a pupil of defendant learning to drive* said automobile, going downgrade approaching White Oak curve, which was flat and sharp and on which the vision was obscured, at an excessive speed and without a careful lookout, and by reason of the foregoing Alta failed to exercise the highest degree of care, and that Virgil failed to exercise the highest degree of care *in permitting Alta to drive the same as a pupil* under said circumstances, and if after entering the curve and discovering the pickup Alta asked Virgil to take over the operation and that Virgil seized the steering wheel and took control of the brake pedal and operated the automobile from a position in the front seat to the right of Alta May and that Virgil, "after taking over the operation of said automobile *from his said pupil,* Alta," failed to exercise the highest degree of care and drove the car to the right and got off the road and lost control, and that such was a failure to exercise the highest degree

of care after he took over control, and that as a direct result of the negligence of Alta and Virgil the automobile overturned, then the verdict should be in favor of plaintiff. Defendant's instruction 8, which the court gave, told the jury in substance that if defendant was exercising the highest degree of care before the pickup came into view and continued to do so until it became apparent the pickup was in the center of the highway and a collision was imminent and defendant was thereby confronted with an emergency, then defendant was required to exercise only the degree of care which a careful and prudent person would exercise under similar circumstances. Plaintiff's instruction 4 countered as follows:

"The court instructs the jury with reference to the sudden emergency doctrine set forth in instruction No. 8 that the said doctrine does not excuse the defendant if the emergency resulted from the defendant's own negligence and you are therefore instructed if you find and believe from the evidence defendant Virgil Burton was confronted with the sudden emergency of avoiding a pickup truck approaching said defendant from the opposite direction immediately before or at the time defendant Virgil Burton seized the steering wheel and controls of his said automobile, and if you find Alta May Ritchey was at the wheel of defendant's car when the pickup truck first appeared at the time mentioned in evidence, and the said Alta May Ritchey *was learning how to drive said car under the tutelage of Virgil Burton* and if you find that the said Alta May Ritchey *was inexperienced in the operation of motor vehicles on the highways of the State of Missouri,* and these facts were known to Virgil Bur-

ton at the time he permitted Alta May Ritchey to drive his said car, and if you further find by permitting Alta May Ritchey to operate his said automobile at the time and place mentioned in evidence the said Virgil Burton failed to exercise the highest degree of care and was negligent, *and that the aforesaid emergency arose because of the said Virgil Burton's negligence in allowing an inexperienced driver, if you so find, to operate his said automobile on the highways of the State of Missouri at the time and place mentioned in evidence,* then you are instructed the sudden emergency doctrine set forth in instruction 8 is no defense to the said defendant Virgil Burton."

■ Before attempting to discuss defendant's remaining assignments we believe a general statement of our view of the law may be helpful in clarifying the conclusions we reach. Stated as a general proposition, an automobile is not in itself a dangerous instrumentality, but it can become such when entrusted to the control of a person who is incompetent to drive it, and consequently one who so delivers his automobile into the hands of an incompetent driver is legally responsible for the injuries resulting from the acts or failures to act of such incompetent; this on the theory that the negligence of the owner and the operator combine to make the negligence which causes the injuries.[2]

■ Some operators are incompetent as a matter of law. This group includes those who are declared by statute to be too young to drive.[3] There are others who might or might not be incompetent by reason of recklessness, lack of experience, or for other reasons. The fact of such incompetency would usually be a jury question.[4]

2. Dinger v. Burnham, 360 Mo. 465, 228 S.W.2d 696, and authorities cited at loc. cit. 699; Lix v. Gastian, Mo.App., 261 S.W.2d 497, and authorities cited at loc. cit. 500; Saunders v. Prue, 235 Mo.App. 1245, 151 S.W.2d 478, 483.

3. Dinger v. Burnham, 360 Mo. 465, 228 S.W.2d 696; Roark v. Stone, 224 Mo.App. 554, 30 S.W.2d 647.

4. Blashfield, Cyclopedia of Automobile Law and Practice, vol. 5, sec. 2924, p. 134;

But of course there can be no liability of the owner to the injured party without *causation,* that is, the act or failure to act on the part of the driver must directly operate to cause or at least contribute to the occurrence which produced the injury; and the failure to have an operator's license could not, of itself, have any causal connection with the accident which produced the injury.[5] What we have just said is in relation to the "dangerous instrumentality" doctrine and is applicable where the management or control is taken out of the hands of the owner and placed in the hands of the incompetent. But where the owner remains in complete charge and control of the vehicle, although another person manually operates the steering wheel and perhaps the brakes and gadgets, we think a more correct theory of liability is on the "alter ego" principle; that is, when one who has the power to dominate the control of the vehicle does not surrender it but remains in charge directing such operation, then the vehicle is not "entrusted" in the sense intended by the dangerous instrumentality rule, but instead the owner continues to operate the vehicle by means of his alter ego, who responds to his dominance in the same way that an automaton or any other intervening device would respond. In the automaton the owner would perhaps express his commands by the pushing of buttons or the twirling of dials, whereas through a living person they would be expressed by the spoken word. The acts of the driver are in reality the acts of the dominating owner who is in charge of the machine.[6] It would seem, in such instance, that the acts or failure to act on the part of the alter ego would properly be submitted as the acts of the owner himself, and this would make the submission much more simple. See the instruction in Kelley v. Thibodeau, 120 Me. 402, 115 A. 162.

■ But we apprehend that the act or failure to act of the alter ego, if such alter ego is inexperienced or otherwise incompetent, could, if properly pleaded, be submitted as a failure of the dominating owner to keep his vehicle under proper control, for the operation of the machine through a faulty means or method, whether it be through an automaton or other device, or a living alter ego, could well be the failure to exercise proper control. However, we think the fact that the owner is a teacher and the person under the wheel is a pupil does not necessarily establish and of itself afford grounds for submission that the pupil is an improper or inefficient means of control. Perhaps this is another way of saying that it is not negligence simply to teach someone else how to drive. There are millions of automobiles on the roads and streets and at least one operator for each of them. Such operators have to learn to drive at some time, and the learning is not something which can be accomplished entirely from books. It has to be absorbed from the doing. Only a small percentage have available private areas which they can use in this seasoning process. It must perforce be accomplished upon the roads which are available. The legislature has

Restatement of the Law of Torts, sec. 390, p. 1058; Lix v. Gastian, Mo.App., 261 S.W.2d 497; Saunders v. Prue, 235 Mo.App. 1245, 151 S.W.2d 478; State ex rel. Leatherman v. Harris, 229 Mo.App. 304, 77 S.W.2d 846, 848; Daily v. Maxwell, 152 Mo.App. 415, 133 S.W. 351; see Bailey v. Simon, La.App., 199 So. 185.

5. 87 A.L.R. 1471; 60 C.J.S., Motor Vehicles, §§ 162, 163, 431, pp. 497, 498, 1061; 5 Am.Jur., Automobiles, sec. 141, p. 586; Faust v. East Prairie Milling Co., Mo.App., 20 S.W.2d 918; Dixon v. Boeving, Mo.App., 208 S.W. 279; see

Sours v. Sours, Ohio Com.Pl., 73 N.E.2d 226.

6. Blashfield, Cyclopedia of Automobile Law and Practice, vol. 5, sec. 2930, p. 153; Frye v. Baskin, Mo.App., 231 S.W.2d 630; Haynie v. Jones, 233 Mo.App. 948, 127 S.W.2d 105; see Counts v. Thomas, Mo.App., 63 S.W.2d 416; see also Greenie v. Nashua Buick Co., 85 N.H. 316, 158 A. 817; Reetz v. Mansfield, 119 Conn. 563, 178 A. 53 (a wheelseizing case); Burwell v. Neumann, 130 Conn. 117, 32 A.2d 640, and authorities cited; Archambault v. Holmes, 125 Conn. 167, 4 A.2d 420.

recognized this necessity by providing for a temporary driver's permit and requiring the presence of a qualified driver in the seat. Section 302.130 RSMo 1949, V.A.M.S. The negligence of the teacher, when such exists, would arise not from the fact of teaching an inexperienced person to drive, but in permitting the driving in such manner and in places and under such circumstances that it would be inappropriate. We find a dearth of cases on this subject, but such as we find indicate that the place and circumstance is an important factor to be considered. In Daily v. Maxwell, 152 Mo.App. 415, 133 S.W. 351 (where the owner was not present but the driver was inexperienced), it was said at loc. cit. 353 that an automobile became a dangerous machine when placed in the hands of a careless and incompetent driver and turned loose on busy streets. In Kelley v. Thibodeau, 120 Me. 402, 115 A. 162, the car was being driven at an unreasonable rate of speed in the business section of a town. In Wilson v. Brauer, 97 N.J.L. 482, 117 A. 699, it was emphasized, loc. cit. 700, that the car was to be driven "upon the streets of a populous city for the purpose of learning how to operate it"; and again, that it was a dangerous machine "to turn loose on busy streets and would constitute a menace to travelers." In Easton v. United Trade School Contracting Co., 173 Cal. 199, 159 P. 597, 599, L.R.A. 1917A, 394, the employee of a school for the teaching of automobile driving took a pupil to Central Avenue in Los Angeles, where the pupil tried to drive between a street car and a buggy. Defendant was held liable because it was "under whose directions all of these things were done". In Greenie v. Nashua Buick Co., 85 N.H. 316, 158 A. 817, the pupil was allowed to drive on a well-traveled street which was a part of the state highway system, and the driving was across an eight-foot sidewalk. In that case the jury found the teacher liable and absolved the pupil, and such verdicts were upheld. The distinction is nicely shown in Cullinan v. Kooharian, 51 R.I. 250, 153 A. 877, where a teacher took his pupil to a park and there put him under the wheel. Afterwards the pupil tried to drive out of the park and onto Broad Street into the traffic. Because defendant attempted to prevent the departure from the park into Broad Street the case was remitted with direction to enter judgment for the defendant.

Negligence in using an inferior alter ego to control the automobile would arise not from the fact she was a *pupil* but from the fact, if such was a fact, that she was so inexperienced as to make it unsafe *under the circumstances*. The word "experienced" is indefinite and depends upon many things, including the aptness of the pupil, the length of periods of practice, number of such periods and the conditions under which they were had. Persons in all walks of life are often experienced and yet feel the need of further learning. It is the mark of a superior person that, although experienced, he may strive for greater proficiency. In this instance the only evidence on the subject came from Virgil and Alta. Alta said she had had some previous driving experience and Virgil said she appeared to be skillful. He was teaching her hand signals and driving speeds under different conditions. As to when a person ceases to be inexperienced and becomes experienced, no fixed line can be drawn and, if it was submissible under the pleadings, it was a jury question as to whether or not the driver, in this instance Alta, the alter ego, was sufficiently experienced to be in manual control of the automobile at the time, place and under the circumstances shown in the evidence.

Defendant-appellant says he was "ambushed" because the plaintiff did not plead inexperience of Alta and negligence in permitting her to operate the car and that the case was tried and submitted not only upon her inexperience, but also upon the theory that Alta was an incompetent driver due to the fact she was unlicensed and that Virgil was consequently guilty of negligence. The first statement in the paragraph charging the cause is that Virgil was teaching Alta

how to drive. Then follows the statement that as they approached the place where the car turned over *they negligently and carelessly exchanged control.* Then followed the specific charges of negligence against the defendant in excessive speed, failure of control, failure to keep a lookout and carelessly swerving off the highway.

The petition does not charge that Virgil was *negligently* teaching Alta, nor that Alta was inexperienced, nor does it set forth any circumstance (such as a dangerous curve ahead) whereunder the teaching of Alta would be said to be negligence, nor does it charge that Alta was negligent in any respect except in participating in the exchange of control. A reading of this statement would not inform the careful defendant that he was charged with negligence in teaching an inexperienced person how to drive under circumstances which would make it improper so to do, but would lead him to believe that he was charged with negligence (as the petition said) in exchanging control and in the operation of the automobile during and after such exchange of control. Assuming that negligence in permitting an alter ego to drive under certain circumstances might be a failure to keep the automobile under control, it should be pleaded in such manner as not to mislead or entrap the opposing party.

■ The office of the petition is to inform the defendant of what he must defend against.[7] And where the defendant, as here, makes his objection at the first opportunity, pleadings are to be construed most strongly against the pleader,[8] and their construction must be such as to do substantial justice.[9] One cannot plead one basis for his cause and submit it upon a different theory, even though, had it been properly pleaded, it would have been submissible.[10] We agree with appellant that the pleadings do not fairly open the issue of the inexperience of Alta and the negligence of the defendant in permitting her to drive.

■ And we think that plaintiff's instructions 2 and 4, when taken in combination, do not properly submit the issue. Instruction 2 did not submit the exchange of control as a ground of negligence but instead submitted the alter ego theory, hypothesized the condition of the curve, negligence on Alta's part as to speed and lookout and the negligence of Virgil in letting her drive and his negligence in operating the car after the exchange of control, all in the conjunctive. It referred to the fact that Alta was a pupil four different times. Instruction 4 told the jury that if Alta was at the wheel when the pickup appeared and if she was learning to drive "under the tutelage of Virgil" and was inexperienced and the emergency *arose because of Virgil's negligence in allowing her to operate his automobile* "on the highways of the State of Missouri at the time and place mentioned in evidence," then the emergency doctrine would not apply. Under the evidence Alta had been driving on the highways that day, including the county highway prior to entering upon Highway 37, and for some distance before coming to the curve. The expression itself does not tie the negligence, if any, in letting Alta drive, to the curve where the accident occurred; nor does it hypothesize the condition of such curve. We realize that hypothesization with particularity may not always be necessary in the giving of a non-verdict-directing instruction, but as a general proposition one who offers the jury a conclusion to be reached should hypothesize all facts which, if found to be true, are legally sufficient to permit the

7. Hensley v. Dorr, Mo.App., 202 S.W.2d 553; De Mott v. Great American Ins. Co. of New York, 234 Mo.App. 31, 131 S.W.2d 64.

8. E. C. Robinson Lumber Co. v. Ladman, Mo.App., 255 S.W.2d 72, and cases cited at loc. cit. 78.

9. DeVault v. Truman, 354 Mo. 1193, 194 S.W.2d 29, 32.

10. Anderson v. Kraft, Mo.App., 129 S.W.2d 85, certiorari quashed State ex rel. Anderson v. Hostetter, 346 Mo. 249, 140 S.W.2d 21; Stupp v. Fred J. Swaine Mfg. Co., Mo.Sup., 229 S.W.2d 681, 685.

jury to arrive at the conclusion drawn.[11] Negligence depends upon the surrounding circumstances, and an act or omission which would clearly be negligent in some circumstances may not be negligent in other circumstances and surroundings.[12] And one having chosen to direct the jury's attention to a specific set of facts may not eliminate one essential fact and then attempt to supply it by a "catch-all" phrase.[13]

■ We also recognize that repetition in instructions is not often ground for reversal,[14] the test being whether the subject is so unduly emphasized as to mislead, confuse or improperly impress the jury.[15]

■ That an instruction must be viewed and considered in the light of the other instructions, the pleadings and the evidence requires no citation of authority. Should it not also be considered in the light of what has happened at the trial in reference to improper interjections which have been objected to and not withdrawn from the jury's consideration when we are trying to determine whether the jury was confused or misled by its language?

■ As it is, we think the jury [assisted down a mental path by the emphasis made during trial by repeated reference, even after objections had been sustained, to the fact that Alta was "unlicensed" (and was also inexperienced), and the emphasis made by the somewhat unnecessary repetitious use of the word "pupil"] could well have understood the instructions, taken together, to mean that Virgil was guilty of antecedent negligence simply in teaching

Alta how to drive. Instructions should not be so framed as to be susceptible of different interpretations by the jury.[16] And it is not entirely a question of the technical correctness of the instructions, but, in the language of the Supreme Court of Minnesota in Zurko v. Gilquist, 241 Minn. 1, 62 N.W.2d 351, at loc. cit. 354, "On the other hand, in construing a jury charge as a whole, it must be scrutinized and tested from the standpoint of its total impact or impression upon the jury. If as a whole its impact gives the jury an erroneous conception of the controlling principles of law, then it cannot be defended and found sufficient as a whole by a careful analysis of the technical relations of its various provisions to each other when such technical relationships would not reasonably have been apparent to the jury. * * * Even though a jury charge may by close inspection be found to be technically correct in its entirety, a new trial should be granted if its impact upon the jury is likely to convey, and reasonably does convey, an erroneous understanding of controlling principles of law."

■ It is our conclusion that all the things which we have mentioned, when taken in the aggregate, made the instructions an unfair, and therefore incorrect, submission of the issues.

For the foregoing reasons the cause is reversed and remanded.

McDOWELL, P. J., and STONE, J., concur.

11. Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496; Voyles v. Columbia Terminals Co., Mo.App., 239 S.W.2d 559; Crites v. Bollinger, Mo.App., 238 S.W.2d 26, 30; Benham v. McCoy, Mo.Sup., 213 S.W.2d 914.

12. Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972, 978.

13. Rohde v. St. Louis Public Service Co., Mo.Sup., 249 S.W.2d 417, 421.

14. Leathers v. Sikeston Coca-Cola Bottling Co., Mo.App., 286 S.W.2d 393, 398.

15. Ostmann v. Ostmann, Mo.Sup., 183 S.W.2d 133.

16. Schipper v. Brashear, Mo.Sup., 132 S.W.2d 993, 996, 125 A.L.R. 674; Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W.2d 70, 75; Hopkins v. Highland Dairy Farms Co., 348 Mo. 1158, 159 S.W.2d 254; see Catanzaro v. McKay, Mo.Sup., 277 S.W.2d 566, 570; see Prague v. Eddy (banc), 358 Mo. 327, 214 S.W.2d 521.