R. T. MOORE and Carol Moore,
Plaintiffs-Respondents,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, De-
fendant-Appellant.

No. 8291.

Springfield Court of Appeals.

Missouri.

July 15, 1964.

Gerald H. Lowther, James K. Prewitt, Springfield, for defendant-appellant.

Homer D. Wampler, Jr., B. H. Clampett, Springfield, for plaintiffs-respondents.

STONE, Judge.

In this court-tried action at law, plaintiffs R. T. (Tarrant) and Carol Moore, who are husband and wife, obtained judgment in the aggregate sum of $1,510.06 (including $1,054.60 for actual damages, $105.46 for statutory penalty [Sec. 375.420], and $350.-00 for attorneys' fees) against State Farm Mutual Automobile Insurance Company (hereinafter called the Company) under the $50 deductible collision coverage alleged to have been afforded by a policy issued by the Company to plaintiffs as the named insureds. (All statutory references are to RSMo 1959, V.A.M.S.) Defendant appeals.

Plaintiffs are long-time residents of Greenfield, Missouri. In November 1961, Charles Ross Moore, plaintiffs' son then twenty years of age, lived in the home of his maternal aunt, Mrs. Maxine Thomas, in Columbia, Missouri, and worked as a clerk at Noel's United Supermarket in that city. Charles' attention was attracted by a 1958 MG roadster (hereinafter referred to as the MG) on the Columbia used car lot of Copeland Foreign Cars, a copartnership composed of Kenneth W. Copeland and Gerald Morris. Having determined to acquire the MG but being hindered in financing the purchase by the fact of his minority, Charles called his father, plaintiff Tarrant, over long distance from the Copeland lot on the Saturday before Thanksgiving, i. e., on November 18, 1961, and persuaded his father to "sign for me

[Charles]." Thus assured of his father's cooperation, Charles made a down payment of $200 that same afternoon, signed the note (for the balance of the purchase price) which was to be mailed to his father for signature, and had an understanding with Copeland's representative (one Ribolt) that he (Charles) would pick up the MG on Thanksgiving Eve, November 22.

On the following Monday, November 20, plaintiff Tarrant received in the mail the note (signed by Charles) and a chattel mortgage, both instruments being "in blank"—"they weren't filled in." The same day he talked with Chester Ball, the Company's agent at Greenfield, through whom plaintiffs theretofore had procured insurance coverage on a 1958 Mercury sedan and a 1949 Chevrolet sedan, the only two automobiles then owned by them, under separate policies issued by the Company. Informing Ball that "my boy was wanting to buy a car," plaintiff Tarrant asked Ball (1) about signing the note and chattel mortgage in blank and (2) "about insurance." On the first subject of inquiry, Ball said "it'd be foolish to sign something in blank" so, although plaintiff Tarrant signed the instruments, he returned them to his sister-in-law, Mrs. Thomas, that she and her husband might make sure that the instruments were "filled in correctly" when delivered to dealer Copeland. With respect to insurance coverage on the MG, plaintiff Tarrant testified that "he [agent Ball] said that he would insure it, but he needed the motor number." There was no evidence that such information ever was supplied.

On the appointed date, to wit, on Thanksgiving Eve, November 22, Charles took possession of the MG at the Copeland lot. Both partners, Copeland and Morris, were on a business trip to Chicago at that time, and Charles dealt with an employee not identified by name. To the inquiry "did you get any papers at that time, or did anybody say anything to you about papers, or did you just get the car," Charles responded "I just got the car." When Copeland and Morris returned that even-

ing, the MG was gone. "Papers" pertaining to this transaction, which Morris had prepared before leaving for Chicago, were still on the office desk, so Copeland and Morris said. Sans "papers" but with a companion, Charles started for Greenfield the next morning, i. e., on Thanksgiving Day, November 23. But before he had gone very far, more specifically about seven miles from Jefferson City, he took the MG into a ditch while passing a truck and meeting another vehicle, and the MG was "pretty well demolished" as it rolled over six times. For the damage then done to the MG, plaintiffs sought to recover under the $50 deductible collision coverage afforded by the Company's policy theretofore issued to plaintiffs on their 1958 Mercury sedan. We note parenthetically that the Company's policy on plaintiffs' 1949 Chevrolet sedan provided liability, but *not* collision, coverage. The Company never issued a policy on the MG or received any additional premium for coverage thereon.

At this point in our factual review, we backtrack to pick up the thread of title to the MG in the State of Arkansas where on March 28, 1961, an Arkansas certificate of title was issued to William M. Durham of Arkadelphia, Arkansas. On October 16, 1961, Durham sold the MG to Proctor and Brown Used Cars (a copartnership composed of Waldo Proctor and Oscar Brown) at Columbia, Missouri, and executed the "Assignment of Title" on the reverse side of the Arkansas certificate. Oscar Brown, as notary public, purported to take the acknowledgment on the assignment. On November 1, 1961, Proctor and Brown Used Cars sold the MG to Copeland Foreign Cars and executed the form reassignment on the reverse side of the Arkansas certificate of title. Oscar Brown, as notary public, again purported to take the acknowledgment on the reassignment which was signed "Proctor & Brown Used Cars—By Waldo Proctor (Partner)." Neither Proctor and Brown Used Cars nor Copeland Foreign Cars obtained a Missouri certificate of title to the MG.

Just what title "papers" may have been lying on the desk when plaintiffs' son Charles picked up the MG at the Copeland lot on November 22, 1961, is not clear from the record. When asked, "what papers did you prepare," Gerald Morris, one of the partners in Copeland Foreign Cars, gave this obfuscous answer, "a bill to make out your title for for [sic] a new title, transferring the title into Mr. Moore's name." At another point, Morris said, "I made a new certificate out for a new title for it and notarized it." But whatever "papers" Morris may have prepared, admittedly none of them were passed to Charles or to plaintiffs prior to the accident on Thanksgiving Day, November 23. According to dealer Copeland (the only witness who testified on this point), it was some time after the following Monday, November 27, before "the application for a new title" passed out of his hands. He thought that it had been picked up by Mrs. Maxine Thomas, Charles' aunt, but "it could have been mailed." And it was August 31, 1962, more than eight months after the accident, before a Missouri certificate of title was issued for the MG. At that time, the Arkansas certificate of title to the MG was surrendered to the Missouri Department of Revenue (Motor Vehicle Registration), "Missouri Certificate of Cancel [sic] Title Number 1670232" was issued in the name of "Copeland Foreign Cars" upon the application of that firm signed by Gerald Morris, and Missouri Certificate of Title Number 1670233 was issued in the name of "Dr. Tarrant Moore" upon his application which showed November 22, 1961, as the date of purchase of the MG and was accompanied by his "Affidavit of Non-Use" of that vehicle.

Instant plaintiffs' pleaded theory, and the only theory suggested prior to judgment, was that the Company's policy in force on plaintiffs' 1958 Mercury sedan at the time of the accident under consideration (hereinafter referred to as the policy) afforded $50 deductible collision coverage on the MG as *"a newly acquired automo-*

*bile."* Under Coverage G of the policy, the Company agreed "to pay for loss to *the owned automobile* caused by collision \* \* in excess of the deductible amount stated in the declarations [$50] \* \* \*." (All emphasis herein is ours.) In its "Definitions" section, the policy provided that *"owned automobile* means the private passenger automobile \* \* \* described in the declarations [plaintiffs' 1958 Mercury sedan] and includes \* \* \* *a newly acquired automobile* \* \* \*," and that *"newly acquired automobile* means an automobile, *ownership of which is acquired by the named insured* [plaintiffs] if (1) it replaces an automobile owned by the named insured and covered by this policy, or the company insures all automobiles owned by the named insured on the date of its delivery, and (2) the named insured notifies the company within thirty days following such delivery date. The named insured shall pay any additional premium required because of the application of the insurance to such newly acquired automobile."

Since the Company insured "all automobiles" then owned by plaintiffs, namely, a 1958 Chrysler sedan and a 1949 Chevrolet sedan (although there was no collision coverage on the latter), whether or not, at the time of accident, the policy afforded collision coverage on the MG as a "newly acquired automobile" depended upon whether or not plaintiffs then had acquired ownership of that automobile. In considering this question, we assume (*without, however, so deciding*) that, when Charles took possession of the MG on November 22, 1961, Copeland Foreign Cars owned that vehicle and could have conveyed ownership thereof to plaintiffs. We thus pass, as unnecessary to proper disposition of this appeal, determination of defendant's point running along the line that a properly-acknowledged

assignment of the Arkansas certificate of title for the MG was essential to vest title in Proctor and Brown Used Cars and likewise a properly-acknowledged reassignment of that Arkansas certificate was essential to vest title in Copeland Foreign Cars; that the acknowledgments on the assignment and reassignment of the Arkansas certificate were invalid because Oscar Brown, the notary public, being a partner in Proctor and Brown Used Cars which firm had no legal existence apart from its members [Davison v. Farr, Mo.App., 273 S.W.2d 500, 502–503(1, 2), and cases there cited], had no authority to take such acknowledgments; and that, therefore, ownership of the MG had not been acquired by Copeland Foreign Cars in November 1961 and thus could not have been conveyed by Copeland to plaintiffs. Cf. Pearl v. Interstate Securities Co., 357 Mo. 160, 165, 206 S.W.2d 975, 978(10–11); Peper v. American Exchange Nat. Bank in St. Louis, 357 Mo. 652, 210 S.W.2d 41; Fitzgibbon Discount Corp. v. Roberts, Mo.App., 283 S.W.2d 906, 908(1, 2).

■ Section 301.210 is applicable and controlling "[i]n the event of a sale or transfer of ownership of a motor vehicle or trailer [in Missouri] for which a certificate of ownership has been issued," either in this or another state.[1] In subsection 4 of the cited statute, the General Assembly has made it *"unlawful* for any person to buy or sell in this state any motor vehicle" so registered [Lebcowitz v. Simms, Mo.App., 300 S.W.2d 827, 829–830] "unless at the time of the delivery thereof, there shall pass between the parties such certificate of ownership with an assignment thereof, as herein provided," and has declared that any purported sale "without the assignment of such certificate of ownership, shall be *fraudulent* and *void."* The cases are legion in

---

1. Pearson v. Allied Finance Co., Mo.App., 366 S.W.2d 6, 8(2); Bordman Investment Co. v. Peoples Bank of Kansas City, Mo.App., 320 S.W.2d 72, 77–78(6); Lebcowitz v. Simms, Mo.App., 300 S.W.2d 827, 830(2, 3); Craig v. Rueseler Motor Co., Mo.App., 159 S.W.2d 374, 378 (5–7); Platner v. Bourne, Mo.App., 275 S.W. 590(2); Mackie and Williams Food Stores v. Anchor Casualty Co., 8 Cir., 216 F.2d 317.

which our appellate courts have stated emphatically that the provisions and requirements of Section 301.210 are absolute and mandatory and that the purported purchaser of a motor vehicle to whom a properly-assigned certificate of ownership is not passed at the time of delivery of such vehicle not only does not become the owner thereof[2] but also does not acquire any insurable interest therein.[3]

In the case at bar, the Arkansas certificate of title to the MG *never* was reassigned to plaintiffs as it might have been by execution of a form "Reassignment by Registered Dealer" to be attached to the Arkansas certificate. Whether the plain mandatory requirements of Section 301.210[4] would have been satisfied *if*, at the time of delivery of the MG to Charles on November 22 (or prior to the accident on November 23), Copeland Foreign Cars had delivered to Charles the Arkansas certificate *not* reassigned to plaintiffs or to plaintiff Tarrant, but with Copeland's application for a "Mis-souri Certificate of Cancel [sic] Title" and an application for a Missouri certificate prepared for signature by plaintiffs or by plaintiff Tarrant, is a provocative but academic question. For, although partners Copeland and Morris testified that some title "papers" had been prepared and left on an office desk at the Copeland lot, and although they may have intended that those papers be given to Charles when the MG was delivered to him, the simple and ungilded truth of the matter is that nothing whatever passed between the parties when Charles took the MG on November 22 (or, for that matter, at any time prior to the accident). Section 301.210 contains "no exceptions to conform to intentions" [Allstate Insurance Co. v. Hartford Acc. & Ind. Co., Mo.App., 311 S.W.2d 41, 46; Public Finance Corp. of Kansas City v. Shemwell, Mo.App., 345 S.W.2d 494, 498], and "under the law as written there can be no exceptions in favor of those not intentionally guilty of wrongdoing." Robertson v. Snider, Mo.App., 63 S.W.2d 508, 509;

2. Sabella v. American Indemnity Co., Mo. (banc), 372 S.W.2d 36, 40; Kelso v. Kelso, Mo., 306 S.W.2d 534, 538(5), 539(6), 71 A.L.R.2d 258; State ex rel. Connecticut Fire Ins. Co. of Hartford, Conn. v. Cox, 306 Mo. 537, 268 S.W. 87, 37 A.L.R. 1456; Pearson, supra, 366 S.W.2d loc. cit. 8–9(3); M. F. A. Cooperative Ass'n. of Mansfield v. Murray, Mo.App., 365 S.W.2d 279, 286; Haynes v. Linder, Mo.App., 323 S.W.2d 505, 511(10); Bordman Investment Co., supra, 320 S.W.2d loc. cit. 78(7); Allstate Ins. Co. v. Hartford Acc. & Ind. Co., Mo.App., 311 S.W.2d 41, 46(3); Kesinger v. Burtrum, Mo.App., 295 S.W.2d 605, 608(6); Fowler v. Golden, 240 Mo.App. 627, 212 S.W.2d 93, 94(1, 2); Personal Finance Co. of Missouri v. Lewis Inv. Co., Mo. App., 138 S.W.2d 655, 656(1); Universal Credit Co. v. Story, Mo.App., 128 S.W.2d 654, 656(1, 2); Hoshaw v. Fenton, 232 Mo.App. 137, 110 S.W.2d 1140, 1143(7–9); Boyer v. Garner, Mo.App., 15 S.W.2d 893, 894; Mathes v. Westchester Fire Ins. Co. of New York, Mo.App., 6 S.W.2d 66, 68(2).

3. Sabella, supra, 372 S.W.2d loc. cit. 40; Kelso, supra, 306 S.W.2d loc. cit. 538(5); Pearl v. Interstate Securities Co., 357 Mo. 160, 166, 206 S.W.2d 975, 979 (17); State ex rel. Connecticut Fire Ins. Co. of Hartford, Conn v. Cox, supra note 2; Haynes, supra, 323 S.W.2d loc. cit. 512(12); Bordman Investment Co., supra, 320 S.W.2d loc. cit. 78(7); Personal Finance Co. of Missouri, supra, 138 S.W.2d loc. cit. 656(1); Evens v. Home Ins. Co. of New York, 231 Mo. App., 932, 82 S.W.2d 111, 115–116(1); Mathes, supra, 6 S.W.2d loc. cit. 68(3); Mackie and Williams Food Stores, supra, 216 F.2d loc. cit. 320–321(3, 4).

4. It is required in *subsection 1* that "the holder of such certificate [of ownership] shall indorse on the same an assignment thereof ※ ※ ※ and deliver the same to the buyer at the time of the delivery to him of said motor vehicle," in *subsection 2* that "[t]he buyer shall then present such certificate, assigned as aforesaid, to the director of revenue," and in *subsection 4* that it shall be unlawful to buy or sell any registered motor vehicle "unless at the time of the delivery thereof, there shall pass between the parties such certificate of ownership with an assignment thereof, as herein provided," and the attempted sale of any such vehicle "without the assignment of such certificate of ownership, shall be fraudulent and void."

Mackie and Williams Food Stores v. Anchor Casualty Co., 8 Cir., 216 F.2d 317, 322. In short, the courts are not authorized to accept mere intention to comply with the law as the equivalent of compliance [cf. Mathes v. Westchester Fire Ins. Co. of New York, Mo.App., 6 S.W.2d 66, 67], or to determine cases in this general category on the basis of what may seem to be the fireside equities of the situation. See Hoshaw v. Fenton, 232 Mo.App. 137, 142, 110 S.W. 2d 1140, 1143; Weaver v. Lake, Mo.App., 4 S.W.2d 834, 835.

There is in the case at bar no factual basis to invoke application of the one continuous transaction doctrine under which the validity of purchase money notes and mortgages was sustained in Ashby v. National Bond Finance Co., Mo.App., 343 S.W.2d 218, and World Investment Co. v. Kolburt, Mo.App., 317 S.W.2d 697, cited and relied upon by instant plaintiffs. Viewed in the light most favorable to plaintiffs, the transaction under scrutiny was one in which their son Charles took possession of the MG under an executory contract to complete a sale of that automobile in the future. Cf. Allstate Insurance Co., supra, 311 S.W.2d loc. cit. 47; Sabella v. American Indemnity Co., Mo. (banc), 372 S.W.2d 36, 40. Ownership of the MG had not been acquired by plaintiffs (or by plaintiff Tarrant) prior to the accident on November 23, 1961, and they are not entitled to recover on their pleaded trial theory that, at the time of accident, the policy afforded coverage on the MG as a "newly acquired automobile."

While the case was under submission in the trial court, plaintiffs in an after-trial brief presented for the first time an alternate theory, to wit, that, if plaintiffs had *not* acquired ownership of the MG at the time of accident, nevertheless the collision loss was payable to them under the so-called *"non-owned automobiles"* coverage afforded by the policy. By Insuring Agreement II in the policy, the Company agreed that "such insurance as is afforded under coverages A, B, * * * G and H with respect to the owned automobile applies to *the use of a non-owned automobile by the named insured or a relative * * *"*; and, in its "Definitions" section, the policy provided that *"relative* means a relative of the named insured *who is a resident of the same household."* Plaintiffs' counsel present this theory here as if a finding that Charles was, at the time of accident, "a resident of the same household" as his parents was the only prerequisite to appellate affirmance of their judgment. Although we are not prepared to follow counsel to their conclusion that Charles was "a resident of the same household," we need not discuss or rule that contention on its merits for other considerations are dispositive of plaintiffs' claim on the "non-owned automobile" theory.

■■ Having pleaded a cause of action on the theory that they had acquired ownership of the MG, i. e., on the *"newly acquired automobile"* theory, plaintiffs could not recover in the circuit court, and may not support here the erroneous judgment nisi, on the altogether different and wholly inconsistent theory that they had *not* acquired ownership, i. e., on the *"non-owned automobile"* theory.[5] Furthermore, nothing is better settled than that an appellate court will review a case only upon the theory upon which it was tried [6] and that a party will be held on appeal to his theory upon trial.[7]

---

5. Kemp v. Woods, 363 Mo. 427, 251 S.W. 2d 684, 687–688(2, 6); Hilderbrand v. Anderson, Mo.App., 270 S.W.2d 406, 409 (2); Ritchie v. Burton, Mo.App., 292 S.W.2d 599, 609(11); Copher v. Barbee, Mo.App., 361 S.W.2d 137, 145(9).

6. Olsten v. Susman, Mo., 362 S.W.2d 612, 614(3); Voelker v. St. Louis Mercantile Library Ass'n., Mo., 359 S.W.2d 689, 693

(2); Welch v. McNeely, Mo., 269 S.W.2d 871, 875(2); Griffin v. Anderson, Mo. App., 369 S.W.2d 889, 892(7).

7. King v. Guy, Mo.App., 297 S.W.2d 617, 625(16); Hill v. Seaboard Fire & Marine Ins. Co., Mo.App., 374 S.W.2d 606, 610 (6); Greathouse v. Wolff, Mo.App., 360 S.W.2d 297, 301(2); Wardin v. Quinn, Mo.App., 324 S.W.2d 151, 154(3).

But if the case properly were for consideration on the "non-owned automobile" theory, there would be an insuperable legal impediment to plaintiffs' recovery on that theory. As a prerequisite to enforcement of an insurance policy insofar as it may afford coverage against damage to property by reason of fire, theft or collision, public policy demands that the insured have an insurable interest in such property at the time of loss.[8] Otherwise, the policy would be a mere wagering contract condemned by the law. Having had no insurable interest in the MG at the time of the collision loss on November 23, 1961,[9] plaintiffs could not have recovered in the instant suit on any theory. The definitions of "insurable interest" in plaintiffs' cited cases [American Central Ins. Co. v. Kirby, Mo. App., 294 S.W.2d 556, 561(3); Bernhardt v. Boeuf & Berger Mutual Ins. Co., Mo. App., 319 S.W.2d 672, 674(1)], which were suits to recover for damage to *buildings,* can find no application in this action involving a *motor vehicle.* See Still v. Travelers Indemnity Co., Mo., 374 S.W.2d 95, 99. "Our legislature, in its wisdom, has placed the sales of used automobiles in a class of its own, with different requirements from those concerning the sales of other chattels. The courts, and the public alike, must recognize and be bound by the action of the legislature, and its effect on the rights of sellers, purchasers and mortgagees of such automobiles." Bordman Investment Co. v. Peoples Bank of Kansas City, Mo. App., 320 S.W.2d 72, 79(9).

The judgment for plaintiffs is reversed.

RUARK, P. J., and HOGAN, J., concur.

---

8. American Central Ins. Co. v. Kirby, Mo.App., 294 S.W.2d 556, 560(2); Estes v. Great American Ins. Co. of New York, Mo.App., 112 S.W.2d 153, 156 (5, 6); Hirsh v. City of New York Ins. Co., 218 Mo.App. 673, 267 S.W. 51(1); Wisecup v. American Ins. Co. of Newark, N. J., 186 Mo.App. 310, 314, 172 S.W. 73, 74; Dupeck v. Union Ins. Co. of America, D.C.Mo., 216 F.Supp. 487, 489 (1); 29 Am.Jur., Insurance, § 433, p. 776; 44 C.J.S. Insurance § 175a, p. 869; 4 Appleman, Insurance Law and Practice, § 2121, p. 17; Id., § 2122, p. 19; 3 Couch on Insurance 2d, § 24:1, p. 60; Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 6—Part 1, § 3501, p. 131.

9. See cases cited in note 3, supra. Consult also 29 Am.Jur., Insurance, § 459, pp. 793–794; 44 C.J.S. Insurance § 177, p. 873; 4 Appleman, op. cit. supra, § 2185, loc. cit. 64; annotation 9 A.L.R. 2d 181, 191.