Joseph H. PRITCHETT and Vivian M. Pritchett, Plaintiffs-Appellees,

and

Margaret Ann Pritchett, Plaintiff-Appellee,

v.

KIMBERLING COVE, INC., Defendant-Appellant,

and

Dando Enterprises, Ltd. and Charles J. Dando, Defendants-Appellees,

and

In the Matter of the Complaint of Recreation Unlimited, Inc. (now Dando Enterprises, Ltd.), owner of a 1971 Classic 170 Motorboat, No. 17071681, Missouri Registry No. MO 4164 GG, for Exoneration From or Limitation of Liability, Appellee,

Joseph H. Pritchett, Vivian M. Pritchett, Margaret Ann Pritchett, Charles J. Oldham, Roma M. Oldham, and Mike Oldham, Appellants.

Nos. 76–1912, 76–1913 and 76–2014.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1977.

Decided Dec. 7, 1977.

Rehearing En Banc Denied in No. 76–1912 Jan. 18, 1978.

As Modified on Denial of Rehearing and Rehearing En Banc in No. 76–1913 Jan. 30, 1978.

Donald E. Bonacker, Springfield, Mo., for Pritchett; Bonacker & Reynolds, Springfield, Mo., on the brief.

James H. Horn, Kansas City, Mo., for Kimberling Cove, Inc.; Charles A. Schliebs, Kansas City, Mo., on the brief.

Glenn A. Burkart, Springfield, Mo., for appellee Charles J. Dando; Wallace Walter, Springfield, Mo., on the brief.

Glenn E. McCann, Kansas City, Mo., for Recreation Unlimited, Inc.; Stephen D. Manz and James E. Welsh, Kansas City, Mo., on the brief.

James K. Prewitt of Prewitt, Jones & Karchmer, Springfield, Mo., on brief of Mike Oldham, Charles J. Oldham and Roma Oldham.

\* The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, sitting by designation.

1. The Honorable William R. Collinson, District Judge for the Western District of Missouri, entered final judgment on September 16, 1976.

2. Mr. and Mrs. Joseph Pritchett appealed the holding of no liability on the part of Recreation and Dando in Appeal No. 76–1913; Kimberling appealed the adverse judgment of liability in 76–2014.

Before MATTHES, Senior Circuit Judge, BRIGHT, Circuit Judge, and MILLER, Judge.\*

MILLER, Judge.

This group of consolidated appeals is from the judgment of the district court (opinion unpublished).[1] The cases arose out of a tragic collision between two motorboats on Lake Tablerock in Missouri shortly after dark on August 7, 1971.

## THE CASES

### Civil Action No. 2792 (Involving Appeal Nos. 76–1913 and 76–2014)[2]

This was commenced by Mr. and Mrs. Joseph Pritchett, the parents of Margaret Ann Pritchett, the seriously injured minor operator of a boat owned by her parents, for medical expenses incurred for Margaret Ann Pritchett, loss of services, and damages to their boat. The sole defendant was the minor driver of the other boat, Scott Clifton.

By subsequent amendments, Recreation Unlimited, Inc. (Recreation), whose name was subsequently changed to Dando Enterprises, Ltd., Kimberling Cove, Inc. (Kimberling), and Charles J. Dando (Dando), president of both corporations, were added as defendants.[3] Kimberling was added on the theory that it negligently entrusted to Scott Clifton the motorboat he was driving, which was docked at a marina owned by Kimberling. Recreation was added on the theory that the marina, including the motorboat (which it owned and which was under a rental-sharing arrangement with Kimberling) was operated as a joint enterprise by the two corporations. Dando was added on

3. The jurisdiction of the district court was based in the alternative: (1) in admiralty, because the collision occurred on navigable waters in and controlled by the United States; or (2) diversity, in that plaintiffs were at all times citizens of Kansas, the collision occurred in Missouri, the corporate defendants were incorporated and had their principal place of business in Missouri, and the individual defendants were citizens of Missouri.

the theory that he was carrying on an activity through Kimberling and Recreation, as his agents, which could be lawfully carried on only under a franchise granted by public authority and which involved an unreasonable risk of harm to others; thus, he was subject to liability for physical harm caused by the negligence of the said corporations.

Before trial, Scott Clifton was dismissed by plaintiffs as a defendant.

### Civil Action No. 3122 (Appeal No. 76–1912)

This was filed by Recreation to limit its liability. Recreation acknowledged ownership of the motorboat driven by Clifton, but claimed that it was being driven without its knowledge or consent; also, that since the boat was being operated on navigable waters of the United States at the time of the accident, 46 U.S.C. §§ 183–189 applied.[4] It tendered $3,500.00 (the alleged value of the Recreation boat) with the court.

Mike Oldham, a minor who was a passenger in the Pritchett boat, and his parents filed an answer and claim for damages resulting from personal injuries, alleging negligent entrustment by Recreation to Clifton. His parents also filed a claim for their derivative damages.

Margaret Ann Pritchett filed an answer-counterclaim, alleging a number of grounds of active negligence on Recreation's part. Her parents filed a similar answer-counterclaim.

### Civil Action No. 74 CV 341–S (Involving Appeal Nos. 76–1913 and 76–2014)[5]

This was filed by Margaret Ann Pritchett against Scott Clifton, Kimberling, Recrea-

tion, and Dando. The alleged bases of liability were the same as those in Civil Action No. 2792, *supra*, brought by Mr. and Mrs. Pritchett.

### DISTRICT COURT PROCEEDINGS

The foregoing actions were consolidated, and a bifurcated trial, without a jury, was held on the issue of liability and damages. The court found that Kimberling negligently entrusted the boat to Scott Clifton, and judgments were entered against the last directors of Kimberling, in their capacity as trustees winding up the corporation's business. Damages were assessed at $400,-000.00 in favor of Margaret Ann Pritchett. Mr. and Mrs. Pritchett were awarded medical expenses ($25,783.34) and the value of their boat ($2,900.00) along with prejudgment interest. Damages for Mike Oldham's physical injuries were assessed at $10,-000.00, and an award was made for $3,675.00, plus prejudgment interest, for medical expenses.

Regarding Recreation, the court concluded that there was no joint enterprise between it and Kimberling and, therefore, held that there was no joint liability with Kimberling. Under 46 U.S.C. § 183(a), Recreation's liability was limited to the value of its boat, and the award was divided among the Pritchetts and the Oldhams.

The court also concluded that operating the marina did not involve an unreasonable risk of harm to others under a franchise granted by public authority; therefore, no liability was imposed on Dando.

### FACTS

Kimberling Cove Marina, owned and operated by Kimberling, is on the shoreline of

---

4. 46 U.S.C. § 183(a) provides:

  The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this

section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

  This statute applies even though only a small motorboat is involved. *See Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975).

5. Margaret Ann Pritchett appealed the holding of no liability on the part of Recreation and Dando in Appeal No. 76–1913; Kimberling appealed the adverse judgment of liability in 76–2014.

a large cove on Lake Tablerock in Stone County, Missouri. Both boats involved in the accident were docked there. Scott Clifton was operating a yellow Classic 17 foot motorboat, and Margaret Ann Pritchett was operating a 16 foot motorboat. Both boats were powered by large inboard-outboard engines, 140 and 155 horsepower respectively, and were capable of speeds of about 45 miles per hour. Scott Clifton, who had turned fifteen just two days before the accident, was accompanied by a friend and two girls. There were also two couples in the Pritchett boat.

The boat driven by Clifton had been out on the lake and was returning to the marina. The Pritchett boat had left the marina for the main body of the lake. The boats approached each other on a collision course. Upon impact, the bow of the Clifton boat cut through the Pritchett boat. The trial court found:

> The evidence as to navigation lights was disputed. Similarly, the evidence as to the speed of the two boats was contested.

> The evidence established that the pilot of a boat approaching a lighted marina at night has much more difficulty seeing the navigation lights of a boat between him and the marina, than observing similar lights against an unlighted background, and reduced speed is necessary.

The court further found that there was no negligence or fault in the operation of the Pritchett boat.

Margaret Ann Pritchett received serious and disabling injuries, including a cerebral mass lesion on the left, a shift of the brain midline to the right, and a fracture of the skull. She also received several severe lacerations to muscles and nerve trunks. She was unconscious and in critical condition for many days and was not able to support her own life systems for over two months. Her left eye had to be removed; the right side of her face remains completely paralyzed. She has learned to walk without a cane, albeit with a wide base gait. She has permanent brain damage, which affects her gait, her vision in the right eye, her ability

to speak, and causes headaches, insomnia, and memory difficulties, which make it difficult for her to learn. Mike Oldham received an injury to his nose, mouth, forehead, and left eyelid requiring four operations.

The marina activities included storage of private boats, boat repair facilities, a fuel dock, and rental of pleasure boats. Several dockhands were employed at the marina during the summer of 1971, including Scott Clifton, who was the youngest. His duties included opening and closing the marina, fueling and renting boats, selling merchandise, providing customers with services, instructing them in the operation of rental boats, and protecting the boats in event of a storm or catastrophe. He was regularly responsible for locking up the dockhouse at night. This was located on the fuel dock and contained keys to all boats docked at the marina, including the rental boats. To perform his duties, Scott Clifton was given a set of keys to the marina facilities, including the dockhouse, and thus had access to all of the boats.

As a fringe benefit, dockhands were allowed to use the rental boats without paying rental charges; but the policy of Kimberling was to require permission, usually from the marina manager, before such use. On the night of the accident, Scott Clifton, without permission, took the Classic motorboat from its slip next to the fuel dock by using his key to the dockhouse to obtain the key to the Classic that was kept there.

During the period in which the accident occurred, Recreation was not only selling boats but furnishing boats to the marina for rental by Kimberling. The rental proceeds were divided forty percent to Recreation and sixty percent to Kimberling. There were four boats in the 1971 rental arrangement, including the Classic involved in the accident. Although these were being rented by Kimberling to the public, they, nevertheless, remained on the inventory of Recreation and were available for demonstration and sale by Recreation.

## OPINION

There are three major issues: (1) whether the district court correctly found that Kimberling negligently entrusted the Classic motorboat to Scott Clifton; (2) whether the district court erred in holding that Recreation was not conducting a joint enterprise with Kimberling which would have made Recreation jointly liable with Kimberling for negligent entrustment; and (3) whether Dando is liable for the activities of Kimberling and Recreation under the legal theory earlier discussed under Civil Action No. 2792.

### (1) Negligent Entrustment Issue

The liability of all defendants below is dependent upon whether Kimberling negligently entrusted the Classic motorboat to Scott Clifton.[6]  Pritchetts and Oldhams base their argument on this point upon Restatement (Second) of Torts § 390 (1965), which provides:

> § 390.  Chattel for Use by Person Known to be Incompetent
>
> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

This section of the Restatement was adopted in *Stafford v. Far-Go Van Lines, Inc.*, 485 S.W.2d 481 (Mo.App.1972), and was cited with favor by the Missouri Supreme Court in *Bell v. Green*, 423 S.W.2d 724, 732 (Mo.1968) (en banc).  *Accord, Collins v. Arkansas Cement Co.*, 453 F.2d 512, 514 (8th Cir. 1972) (Arkansas law).

The district court found "as a fact, under all the facts and evidence in this case, that the defendant Kimberling Cove, Inc. negligently entrusted this boat to Scott Clifton." It concluded, as a matter of law, that Kimberling was subject to liability for the physical harm suffered by the plaintiffs.[7]  Considering the entire record before us, we hold that the district court's finding is not clearly erroneous.  Indeed, we would add to the district court's reasons that turning over what, in our view, appears to have been an excessive amount of responsibility (*i.e.*, for opening and closing what Dando described as "the largest marina on a fresh water lake in the Western United States," maintaining 168 rental storage slips, 3 gas slips, 13 ski boats, and 50 fishing boats for rent to the public in addition to the boats carried on Recreation's inventory) to a boy scarcely fifteen years of age was prima facie negligent entrustment.

■ Four elements of proof are necessary to establish negligent entrustment under Missouri law: (1) entrustment of a chattel (directly or through a third party) to

6.  The district court correctly held that admiralty law was applicable since the tort occurred on navigable waters in and controlled by the United States.  Nevertheless, the court, after considering the applicable law of Missouri and of other jurisdictions, applied the doctrine of negligent entrustment.  We are satisfied that the district court was correct.  In *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 980 (8th Cir.), *cert. denied*, 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974), this court said:

> A federal court sitting in admiralty does not sit as a diversity court; therefore, this is not a case "where state substantive law *must* be ascertained and applied."  Rather, admiralty suits are governed by federal substantive and procedural law.  However, a federal court sitting in admiralty need not "invariably refuse to recognize and enforce a liabili-

ty which the State has established in dealing with a maritime subject.  On the contrary, there are numerous instances in which the general maritime law has been modified or supplemented by state action  .  .  . "  Thus, admiralty courts may apply state law by express or implied reference or when the federal law of admiralty is incomplete.  The Supreme Court has sustained the application of state laws which broaden the scope of liability beyond the general maritime standard.  [Citations omitted.]

7.  It should be noted that Missouri courts consider the incompetency (including inexperience and youth) to operate an instrumentality, usually a factual question, absent a statute.  *Ritchie v. Burton*, 292 S.W.2d 599, 606 (Mo.App. 1956), and cases cited in note 4 therein.

another; (2) likelihood that the person to whom the chattel is entrusted will, due to his youth, inexperience, or otherwise, use the chattel in a manner involving an unreasonable risk of harm to himself and others; (3) knowledge of the entrustor (actual or imputed) of such likelihood; and (4) proximate cause of the harm to the plaintiff by the conduct of the entrustee. *Evans v. Allen Auto Rental*, 555 S.W.2d 325 (Mo. 1977) (en banc).

■ Kimberling, through the marina manager and with the knowledge of Frank Clifton (Scott's father), who was the vice president of Kimberling and exercised overall supervision of the marina in Dando's absence, entrusted Scott Clifton with a key to the dockhouse, where keys to approximately 175 boats at the marina were kept. On the night of the collision, Scott Clifton obtained a key to the Classic motorboat from the dockhouse by using the key entrusted to him. Thus, there was an effective entrustment to Scott Clifton of the Classic motorboat.[8]

With regard to whether, under the circumstances, there was a likelihood, due to his youth and inexperience, that Scott Clifton's use of the powerful and fast Classic motorboat would involve an unreasonable risk of harm,[9] we note that he had been permitted to operate the rental motorboats only *during daylight hours* and had not operated a motorboat prior to this particular summer. Indeed, it appears that he had operated these boats on only about ten previous occasions. Defendants point out that he instructed customers in the operation of the rental boats, but the evidence indicates that this instruction was only of the most rudimentary nature, such as how to start and operate the boat. Thus, the district court's finding that "his experience in operating boats of this nature was very limited" is well supported. It should also be noted that Scott Clifton became 15 years of age only three days before the accident. The district court emphasized that Scott Clifton's very poor school record[10] indicated either "an inferior learning ability" or "an attitude of inattention and nonapplication of his mental [faculties], and declared:

> But, in addition to this, his youth and inexperience in the operation of powerful boats of this kind, combined with the natural inclinations of boys of this age to "show off" and to travel at maximum speeds whenever possible, would in themselves supply the likelihood of unreasonable risk of physical harm from his operation of this boat, especially at night.

■ For these reasons we are persuaded that, in the hands of Scott Clifton after dark, the powerful and fast Classic motorboat was a dangerous instrument likely to cause an unreasonable risk of harm not only to himself but to others as well. *Evans v. Allen Auto Rental, supra.*

■ On the question of whether Kimberling knew, or had reason to know, that Scott Clifton would likely operate a rental motorboat in a manner involving an unreasonable risk of harm,[11] the district court

---

8. It was Kimberling's intent that Scott Clifton use the keys *to its rental boats* kept in the dockhouse to move the boats in case of a storm or catastrophe and to demonstrate the operation of the rental boats to customers. Also, it was expected that he would use the key to the dockhouse to obtain keys to the rental boats he used without charge for his own personal enjoyment after working hours.

9. A nondangerous instrumentality can become dangerous when placed in the hands of an incompetent or inexperienced person. *See Dinger v. Burnham*, 360 Mo. 465, 228 S.W.2d 696, 699 (1950); *Thomasson v. Winsett*, 310 S.W.2d 33, 36 (Mo.App.1958); *Ritchie v. Burton, supra.*

10. His school grades showed that, of the last 55 grades, he had received 23 D's and 22 F's.

11. We agree that Kimberling can only be liable for negligent entrustment if Scott Clifton was negligently operating the motorboat at the time of the accident. However, we do not agree with the contention that the district court made no finding on Scott Clifton's negligence. Although there was no *specific* finding of his negligence, the opinion clearly shows that his negligence was basic to the district court's decision. As this court said in *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 212 n.16 (8th Cir. 1974):

> Findings of fact by the district court . . . are not jurisdictional in an appellate court.

found that Kimberling had reason to have such knowledge, namely: the knowledge possessed by the marina manager and by its vice president (Scott Clifton's father) concerning Scott's very young age, poor school record, little training in safe operation of the motorboats and no training whatsoever in their operation at night, and "very limited" experience. As stated by the district court, there is common knowledge of the "natural inclinations of teenage boys to impress their teenage friends and to run fast, powerful boats . . . ."

Restatement (Second) of Torts § 390, comment b., indicates that liability will be imposed if the supplier (Kimberling) had reason to know that the other party (Scott Clifton) would use the chattel (motorboat) dangerously because he was incompetent or because he lacked necessary training and experience:

[L]iability is based upon the rule . . . that the actor may not assume that human beings will conduct themselves properly if the facts which are known or should be known to him should make him realize that they are unlikely to do so. Thus, one *who supplies a chattel* for the use of another who knows its exact character and condition *is not entitled to assume that the other will use it safely if the supplier knows* or has reason to know that such other is likely to use it dangerously, as where [1] *the other* belongs to a

class which is notoriously incompetent to use the chattel safely, *or* [2] lacks the training and experience necessary for such use, *or* [3] the supplier knows that the other has on other occasions so acted that the supplier should realize that the chattel is likely to be dangerously used, *or* [4] that the other, though otherwise capable of using the chattel safely, has a propensity or fixed purpose to misuse it. [Emphasis added.]

*See Stafford v. Far-Go Van Lines, Inc., supra; Boland v. Love,* 95 U.S.App.D.C. 337, 222 F.2d 27 (1955). Kimberling argues that its knowledge of Scott Clifton's inexperience and youth is insufficient to charge it with knowledge of the likelihood that he would use the motorboat dangerously. It emphasizes his trustworthiness displayed on the job, the lack of a showing of his propensity to misuse motorboats, and the lack of evidence of his reckless operation of boats on prior occasions. However, these points, though relevant, do not cover all four bases for liability listed in the Restatement quoted above.

It is also argued that for Kimberling to be liable, there must be a finding that it, through its agents, consented to Scott Clifton's use of the motorboat on the night of the accident; that his consent must have been expressed or, at least, shown by a pattern of conduct from which consent could be inferred.[12]

---

An appellate court may render a decision in their absence if it feels that it is in a position to do so. It is in a position to do so when . . . the record itself sufficiently informs the court of the basis for the trial court's decision on the material issue. . . . [Citations omitted.]

*See generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* Civil § 2577 at 699–700 (1971).

The evidence of record supports a finding of negligence on the part of Scott Clifton. Also, the district court found that "reduced speed is necessary" when approaching a lighted dock because of the inability to see outgoing boats. Although the speed of the Classic motorboat driven by Scott Clifton was contested, the district court noted that the severity of its impact across the starboard side of the Pritchett boat indicates that it was traveling at a high rate of speed. Indeed, there is evidence that the Clas-

sic motorboat was traveling at nearly full throttle. Moreover, the court found that there was no negligence in the operation of the Pritchett boat. The court's emphasis on Scott Clifton's inexperience, youth, and poor school record would be irrelevant if it had concluded that he was not negligent.

12. Kimberling cites comment a. to section 308 of the Restatement:

The words "under the control of the actor" are used to indicate that the third person is entitled to possess or use the thing or engage in the activity only by the consent of the actor, and that the actor has reason to believe that by withholding consent he can prevent the third person from using the thing or engaging in the activity.

We note that section 308 is referred to in comment b. to section 390, quoted in part earlier in this opinion.

■ Although it was the policy of Kimberling that its employees obtain permission before using the rental motorboats, and although there is no evidence showing that Scott Clifton had ever been given permission to operate any of those boats at night, he had complete access to the keys to them at all times; also, he admitted at trial that he did not recall any prohibition against using them at night.[13] Obviously, Kimberling's policy was not an adequate safeguard against use of the dockhouse key to gain access to the rental motorboats. Moreover, permission has a negative, as well as an affirmative, connotation. "The absence of a prohibition against an expected or foreseeable or natural use may be strongly indicative that such use is permissible." *Kemp v. MFA Mutual Insurance Co.*, 468 S.W.2d 700, 705 (Mo.App.1971), and cases cited therein. The record here discloses a pattern of conduct wherein permission was always granted when a boat was not needed for rental or when the employee was not scheduled to work.[14]

In *Pierce v. Standow*, 163 Cal.App.2d 286, 329 P.2d 44 (1958), cited with approval in *Stafford v. Far-Go Van Lines, Inc.*, *supra* at 488, a mother had specifically forbidden her 17 year old son to drive, but, nevertheless, gave him the key while he waited in the car after school. The court, holding the mother liable for negligent entrustment, said (329 P.2d at 45):

> The admitted fact that appellant daily entrusted to her son the keys . . . thus putting it in his power to drive the car at will is, in our judgment, sufficient to support the inference . . . that she impliedly consented to his doing so.

*Accord*, *Elkinton v. California State Auto Ass'n*, 173 Cal.App.2d 338, 343 P.2d 396 (1959). The facts supporting a finding of implied consent are even stronger in the instant cases.

■ Accordingly, we hold that the district court correctly concluded that Kimberling was liable for the harm suffered by the plaintiffs.

### (2) Joint Enterprise Issue

Pritchetts and Oldhams predicate liability of Recreation on their contention that it was engaged in a joint enterprise with Kimberling, particularly in the leasing of motorboats, including the Classic. Such a relationship would, if established, supply the "privity or knowledge" required to deny limitation of Recreation's liability under 46 U.S.C. § 183(a), quoted earlier. The district court concluded, as a matter of law, that the relationship between Recreation and Kimberling did ,not constitute a joint enterprise, so that Recreation was not jointly liable with Kimberling.[15]

Kimberling was originally incorporated to operate the marina under an assignment to it of a sublease that had been approved by the Corps of Engineers, which controlled the shoreline of the lake. Its stock was offered to the public, and at the time of the accident there were 120 stockholders. These included appellee Dando and his wife who owned seventy-two percent of the stock, having purchased it in July 1969, after which Dando became president of Kimberling. Some six months later, Recreation, which had been incorporated in April 1969, with its stock wholly owned by Dando, established an office on the marina fuel

13. The evidence discloses that Scott Clifton and the same young people who accompanied him at the time of the accident had used the Classic motorboat without permission on the night before the accident. Although the district court found that he had never been given permission to use the boat at night, the only evidence on the point (Scott Clifton's own testimony) indicates that he was never denied permission.

14. On only one occasion was permission denied Scott Clifton—the afternoon of the accident.

The reason given was that he was scheduled to work, and the boat was required to be available for rental. He subsequently took the boat after completing his scheduled work and after rental hours.

15. Recreation contends that the district court's findings relating to the issue of joint enterprise are factual and, thus, cannot be set aside unless clearly erroneous. However, the conclusion on whether there was a joint enterprise is clearly a conclusion of law.

dock. By April 1971 Recreation had constructed a building and showroom on private property near the marina. Kimberling's rental under the sublease included a percentage of the sales of boats and marina equipment. To reduce this rental, Dando had the sales of boats and marine equipment transferred from Kimberling to Recreation.[16]

Although the records of Kimberling and Recreation were kept separately and accounts were maintained between them, there is persuasive evidence of a joint enterprise relationship between the two corporations. Frank Clifton, father of Scott Clifton, was vice president of both, but solely on the payroll of Recreation; he occasionally oversaw the work of John Hillman, Kimberling's marina manager, and, at the time of the accident, performed general office duties for Kimberling that included slip rentals and dealings with suppliers, creditors, and debtors. A Coralee Patrick was secretary and treasurer for each corporation, and records for both corporations were maintained at the same desk in the Recreation office. Dando performed services as president of each corporation but was paid by neither.[17] Hillman was paid by Kimberling, but he demonstrated Recreation's boats to prospective purchasers and collected accounts receivable owed both Recreation and Kimberling on the same invoice.

There was a similar informal intermingling of the services of the dockhands, including Scott Clifton, by the two corporations. A George Katz worked for and was paid by Recreation, but he cut the grass and picked up trash on Kimberling's land. Immediately prior to going on Recreation's payroll, he was paid by Kimberling for these services. The only difference he noticed was that one check came from one corporation and the next from another.

Scott Clifton's functions were similarly divided between the two corporations. He had been paid by Recreation until two or three days before the accident, when he was transferred from Recreation's payroll to the payroll of Kimberling. However, he had been working on the fuel dock for Kimberling since June.[18] Thus, while employed by Recreation, he was performing the functions and receiving the fringe benefits (*e.g.*, free use of the rental boats) of an employee of Kimberling. Even on the day of the accident, while on Kimberling's payroll, he was waxing one of Recreation's boats in the Recreation building.

In addition to the informal intermingling of services of employees, the two corporations were jointly promoted. They had the same advertising logo on their stationery, the same telephone numbers, and the same post office box at Kimberling City; they had a joint sign at the edge of the property, and each had a sign on the Recreation building. As a result, they created a public impression that they were closely related. It was for this reason that the Corps of Engineers audited the books of Recreation which, except for this relationship with Kimberling, could not have been considered a party to the sublease that had been approved by the district engineer.

As explained by the Restatement,[19] the term "joint enterprise" includes a partnership, but it is broader and extends to a cooperative undertaking to carry out a small number of activities or objectives, or even a single one, entered into by members of the group under such circumstances that all have a voice in directing the conduct of the enterprise. Each is considered the agent or servant of the others, so that the act of any member within the scope of the enterprise is charged vicariously against the

16. The record discloses that, at a Kimberling stockholders' meeting, one of the stockholders attempted (unsuccessfully) to stop the transfer.

17. Testimony indicates that this was to avoid income tax.

18. Confusion over his relationship to the two corporations is demonstrated by his testimony during which he said he only worked for Recreation for a week or two; yet the bookkeeper testified that he was transferred to Kimberling's payroll only a few days before the accident on August 7.

19. Restatement (Second) of Torts § 491 (1965) and comment b. thereto.

rest. Thus, when the negligence of a member of a joint enterprise (acting within the scope of the enterprise) causes harm to a third person, such negligence is imputed to all other members, who become mutually liable. *Rowe v. Brooks*, 329 F.2d 35 (4th Cir. 1964); *Hamilton v. Slover*, 440 S.W.2d 947, 952 (Mo.1969), citing Restatement (Second) of Torts § 491 favorably.

■ The district court described the arrangement involving the rental motorboats, under which Kimberling received sixty percent of the rental income and Recreation forty percent, as a "plain, straight-forward business transaction."[20] Although we agree with this characterization, we disagree with the court's conclusion that the two corporations were not engaged in a joint enterprise—at least insofar as the rental motorboat operation was concerned. All parties recognize that there was an agreement, albeit oral and imprecise. Whatever the terms, they were flexible. For example, the number and type of motorboats were not constant during the boating season. Significantly, Recreation did not treat the rental motorboats as under Kimberling's sole control. Instead, they were maintained on Recreation's sales inventory, and Recreation at all times had full power to substitute, demonstrate, and sell them. It appears that they were used for pleasure by Recreation's employees (including Scott Clifton when he was on Recreation's payroll).

In view of the foregoing, we hold that the district court erred in failing to conclude that the relationship between Recreation and Kimberling involving the rental motorboats constituted a joint enterprise.[21]

■ Also, we are satisfied that the negligent entrustment by Kimberling clearly falls within the scope of the joint enterprise involving the rental motorboats, so that Recreation is jointly liable with Kimberling for the resulting harm to appellants and cannot assert limitation of liability under 46 U.S.C. § 183(a). Obviously the joint enterprise entailed use of the dockhouse key to obtain access to the rental motorboat keys, and it was from such use by Scott Clifton that entrustment of the Classic motorboat arose.[22]

### (3) Issue of Dando's Liability

Appellants argue that Dando is the holder of a franchise granted by public authority which involves an unreasonable risk of harm to others, so that he is subject to liability for physical harm caused by the negligence of Kimberling and Recreation which carried out the franchised activity.[23] They cite the Restatement (Second) of Torts § 428 (1965):

20. The only other findings in the district court's opinion that relate to the joint enterprise issue were:

> There is no evidence that there was any disregard of the separate corporate entities of these corporations by their common officers and directors. The records of each corporation were kept separately and accounts were maintained between them. There was obviously no ulterior motive such as fraud or deception in the operation of the two separate, independent, and noncompetitive businesses of these two companies.

21. Recreation argues that "mere sharing of proceeds or profits of an activity does not, in and of itself, create a joint enterprise." We agree. However, as pointed out above, there was much more to its relationship with Kimberling. It further argues that common ownership and interlocking directors alone are insufficient to establish that two corporations are one. We also agree, but note that our holding relates to the issue of joint enterprise—not to

whether one corporation was the "alter ego" of the other.

22. Recreation is also chargeable with knowledge that such entrustment was negligent for, as in the case of Kimberling, it had knowledge (through its vice president, Scott Clifton's father) concerning Scott's very young age, poor school record, inadequate training, and "very limited" experience; also, there was common knowledge of the natural inclination of teenage boys to impress their teenage friends by running powerful motorboats at a high rate of speed. *See Great Atlantic & Pacific Tea Co. v. Brasileiro*, 159 F.2d 661, 665 (2d Cir.), *cert. denied*, 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849 (1947); *In re Theisen*, 349 F.Supp. 737, 740 (E.D.N.Y.1972); *Beal v. Chicago, B. & Q. R.R.*, 285 S.W. 482, 487 (Mo.1926).

23. Missouri law applies to this issue since there is no applicable admiralty rule. *St. Hilaire Moye v. Henderson, supra.*

§ 428. Contractor's Negligence in Doing Work Which Cannot Lawfully be Done Except Under a Franchise Granted to His Employer

An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying out the activity.

This theory of liability has long been recognized in Missouri. *Williamson v. Southwestern Bell Telephone Co.*, 265 S.W.2d 354, 357 (Mo.1954); *Virgil v. Riss and Co.*, 241 S.W.2d 96, 99 (Mo.App.1951).

The district court, in analyzing the applicability of Restatement § 428, expressed its belief that a lease of land with the permission and authority to operate a marina could not be classified as a "franchise." Moreover, noting that the Restatement, as well as the case law, qualifies "franchise" as one "which involves an unreasonable risk of harm to others," it held that "[t]here is no evidence from which this Court could find that the activity of operating a marina involves any unreasonable risk of harm to others so that even if the sublease could be found to be a 'franchise granted by public authority,' the principle of law stated in the Restatement would still not apply."

▆▆▆ Thus, the controlling issue is whether operation of the marina involved an "unreasonable risk of harm."[24] Comment a. to Restatement § 428 discloses that the activities covered involve the use of instrumentalities "which are peculiarly dangerous unless carefully operated." The concept of "peculiar risk" appears in Restatement § 416 and is defined in Comment d. as follows:

A "peculiar risk" is a risk differing from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work done, which calls for special precautions. (See § 413, Comment b.)[25]

Comment b. to Restatement § 413 further contributes to an understanding of "peculiar risk":

This Section is concerned with special risks, peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable man would recognize the necessity of taking special precautions. The situation is one in which a risk is created which is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity, arising out of the particular situation created, and calling for special precautions.

The Missouri courts are in substantial agreement with the Restatement, holding that the activity must involve an inherent risk of harm which arises out of the nature or character of the work done. In *Southwestern Bell Telephone Co. v. Rawlings Manufacturing Co.*, 359 S.W.2d 393, 398 (Mo.App.1962), the court said:

There is an exception to this where the work, during its progress, creates a peculiar risk of bodily harm to others unless special precautions are taken. If the risk is such that it should be recognized by the employer and personal injury results to a third party by reason of the contractor's

---

24. Our disposition of this issue makes it unnecessary to resolve a hotly contested issue of whether Dando or Kimberling owned the sublease under which the marina was operated.

25. This comment contains the following illuminating example:

Thus if a contractor is employed to transport the employer's goods by truck over the public highway, the employer is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit, because the risk is in no way a peculiar one, and only an ordinary precaution is called for. But if the contractor is employed to transport giant logs weighing several tons over the highway, the employer will be subject to liability for the contractor's failure to take special precautions to anchor them on his trucks.

failure to take necessary precautions, then the nondelegable duty is imposed and the employer held liable. *Stubblefield v. Federal Reserve Bank of St. Louis*, 356 Mo. 1018, 204 S.W.2d 718 [1947].

In *Boulch v. John B. Gutmann Construction Co.*, 366 S.W.2d 21, 31 (Mo.App.1963), the court observed:

> The hauling of dirt in trucks, if done carefully and without negligence on the part of the hauler, is not work which in itself is inherently dangerous. If the contractor directs the subcontractor to perform an act which is intrinsically dangerous to others the general contractor cannot escape liability for injuries that may occur. In such cases the injury flows from the doing of the act as its natural consequence, and not from the manner in which the act is done. *Salmon v. Kansas City*, 241 Mo. 14, 145 S.W. 16 [1912].

See *Underwood v. Crosby*, 447 S.W.2d 566, 568 (Mo.1969) (en banc).

Pritchetts and Oldhams argue the applicability of Restatement § 428, saying that—

> the construction of the marina, the locating of the marina storage facilities in close proximity in the cove and the collection of the keys to all of the boats in a central location [were acts which] . . . substantially increased the risk of harm from unauthorized uses of the boats and required special precautions. Those acts are the acts that result in the "peculiar" risk constituting the "unreasonable risk of harm."

We cannot agree that such acts are "intrinsically dangerous." Appellants have not cited any case in which similar activities have been held to constitute an unreasonable risk of harm. Indeed, almost all of the cases have involved railroads and other common carriers, such as tractor trailers which transport goods over the public highways, where the "peculiar" risk is obvious.[26] We see no practical difference in the risk of harm involved in operating a marina and that involved in operating an automobile service station and garage, where autos are fueled, repaired, and stored. Such "risk" is no more than what is to be expected in the everyday life of a community. Accordingly, we agree with the the district court on this issue.

### Summary

In summary, we (1) affirm the district court's finding of negligent entrustment, which results in liability on the part of Kimberling, (2) reverse the district court's holding on the joint enterprise issue, which results in Recreation's joint liability with Kimberling, and (3) affirm the district court's holding that operating the marina did not involve an unreasonable risk of harm to others under a franchise granted by public authority, so that there is no liability running to Dando. We assess costs one-third to Kimberling, one-third to Recreation, and one-third to Pritchetts.

Affirmed in part and reversed in part.

---

**26.** Appellants cite *American Transit Lines v. Smith*, 246 F.2d 86 (6th Cir.), *cert. denied*, 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 188 (1957) (applying Ohio law), for the proposition that the use of motor vehicles by common carriers on the highway is a "peculiar risk" under Restatement § 428, because it increases the "automobile traffic on the highway." This misses the basis of the court's holding—the potential destructiveness of an accident involving a large tractor trailer.

Clearly, the risk of harm *inherent* in operating a large tractor trailer on the public highways is not comparable to the risk of harm involved in the operation of a marina which services, rents, and stores pleasure boats for the public. Nor is the risk here involved comparable to that involved in *Union Elec. Co. v. Pacific Indemn. Co.*, 422 S.W.2d 87 (Mo.App. 1967), where the defendant maintained 2400 volt overhead, uninsulated power distribution lines. *Compare* Restatement (Second) of Torts § 416, Comment d., *supra* note 25. The district court recognized that the cases cited by appellants concerned common carriers operating under a permit.